*H. G. Middleditch* for defendants.

---

## TERRITORY OF HAWAII *v.* Y. SOGA, Y. TASAKA, M. NEGORO, F. K. MAKINO.

### EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

ARGUED FEBRUARY 4, 5, 1910.                    DECIDED MARCH 5, 1910.

HARTWELL, C.J., PERRY, J., AND CIRCUIT JUDGE WHITNEY IN PLACE OF DE BOLT, J.

CRIMINAL LAW—*conspiracy—evidence—order of proof.*

The statute makes a combination or mutual undertaking or concerting together to incite acts of violence and to threaten and intimidate laborers who should not strike for higher wages or who should return to work punishable as the offense of conspiracy.

A mutual undertaking to arouse discontent of a certain class of Japanese laborers by speeches and newspaper articles tending to incite acts of violence in order to induce them to strike is shown by, or may be inferred from, the evidence in this case.

A mutual undertaking may be inferred from the conduct of the defendants, their mutual relations to each other with reference to a common object and by circumstantial evidence. The order of presenting proofs is immaterial.

The intention of newspaper articles to incite to criminal acts of violence by threats and intimidation may be inferred from their

Territory v. Soga, 20 Haw. 71.

nature and the fact that such acts followed their publication tends to show that the language used in them was susceptible of such meaning in the minds of those whom they were intended to reach.

Incriminating evidence of papers obtained from the possession of the defendants forcibly and without process of law is admissible.

ID.—*practice—instructions.*

The attorney general may allow private counsel to assist prosecution.

It is not error to refuse a continuance of two days in which to plead.

ID.—*constitutional—waiver by statutory authority of the full legal number of twelve jurors and consenting to withdrawal of one juror.*

Such waiver is not in conflict with Art. 3 of the Constitution, the fifth and sixth amendments or Art. 83, Organic Act.

OPINION OF THE COURT BY HARTWELL, C. J.

The defendants were arrested upon the sworn complaint of the high sheriff that on January 13, 1909, in the City and County of Honolulu, they unlawfully, maliciously and fraudulently combined and mutually undertook and concerted together and with other persons whose names were to the affiant unknown "to do what plainly and directly tended to incite and occasion offense and to do what was obviously and directly injurious to another" by conspiring to prevent certain corporations owning sugar plantations in the County of Honolulu from carrying on their business and operating their plantations by intimidating and threatening violence against, and instigating others to intimidate and threaten violence against, and inciting and instigating assaults and batteries upon, all Japanese in the City and County of Honolulu who opposed or should oppose an immediate demand being made by the Japanese laborers upon said plantations for increase of wages and a strike by such Japanese laborers as were refused the demand and upon all Japanese in the city and county who should attempt to persuade any Japanese laborers who should be refused such demand from leaving the employment of the corporations and refusing to con-

Territory v. Soga, 20 Haw. 71.

tinue or renew it, and by intimidation, threats of violence and instigating and inciting others to intimidate and threaten violence and by inciting and instigating assaults and batteries upon all Japanese laborers upon said plantations who should continue to work for them after being notified by the defendants and their co-conspirators to cease and refuse working (for them) and conspiring by similar means to boycott financially and ostracize socially all Japanese who should refuse to join in said unlawful, malicious and fraudulent combination or to use or assist in using or promoting the use by others of the said indirect, sinister and unlawful methods and means for carrying out the said combination and plan and thereby, at the time and place aforesaid, unlawfully, maliciously and fraudulently to prevent the said corporations from exercising their trade or business and them to impoverish contrary to the form of the statute in such case made and provided.

June 14, 1909, the defendants were taken before the first judge of the first circuit court sitting as a committing magistrate, and, demanding a jury trial, were arraigned upon the charge of conspiracy. At the defendants' request the cause was continued until the following day in order to arrange for bonds, etc. On June 19 the defendants asked that "the matter of plea be continued until Monday, June 21, and, the request being denied, objected to the proceeding on the ground that they had not been indicted, which objection was overruled. The defendants then entered a plea of not guilty and moved for a continuance until the 1910 term, which was denied. The bill of exceptions sets forth that on June 19 the defendants moved that the cause be continued for plea until June 21, 1909, and excepted to the denial of their motion. The cause was set down for trial for June 21, at which day City and County Attorney Cathcart appeared for the Territory, Messrs. Kinney, Ballou, Prosser and Anderson assisting the prosecution. The defendants objected to counsel being employed for the prose-

cution and excepted to the overruling of their objection. On July 19 a jury was impaneled to try the cause. After the complaint was read to the jury by counsel for the prosecution and a statement made of what the prosecution expected to prove the defendants moved that they be discharged on the ground that the facts stated, if proven, would not constitute the offense charged and excepted to the denial of the motion.

After a trial occupying twenty-one days the jury rendered a verdict of "guilty of conspiracy in the third degree as charged," to which the defendants excepted as contrary to law, evidence and weight of evidence, giving notice of motion for new trial. They then moved in arrest on the grounds that the court was without jurisdiction under the fifth amendment that "no person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury;" or the sixth amendment providing for trial by an impartial jury, and the third article of the constitution that "the trial of all crimes, except in cases of impeachment, shall be by jury;" or under Sec. 83 of the Organic Act that "no person shall be convicted in any criminal case except by unanimous verdict of the jury;" or under the sixth amendment that "in all criminal proceedings the accused shall enjoy the right to be informed of the nature and cause of the accusation;" or the fifth amendment that "no person shall be compelled in any criminal case to be a witness against himself;" or the fourth amendment requiring "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures;" or under the third article of the treaty with Japan that "The dwellings, manufactories, warehouses, and shops of the citizens or subjects of each of the High Contracting Par ties in the territories of the other, and all premises appertaining thereto destined for the purposes of residence or commerce, shall be respected. It shall not be allowable to proceed to make a search of, or a domiciliary visit to, such dwellings and prem-

iscs, or to examine or inspect books, papers, or accounts, except under the conditions and with the forms prescribed by the laws, ordinances and regulations for citizens or subjects of the country;" or under the fourteenth amendment that "no state shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws;" and because evidence was improperly received and excluded; for error in certain instructions, and because the verdict was contrary to law, evidence and weight of evidence. The defendants excepted to the overruling of their motion in arrest and the court sentenced each defendant to imprisonment without hard labor in Honolulu jail for ten months and a fine of $300 and one-fourth of the costs. The defendants then filed a motion for a new trial and excepted to its denial.

The exception to allowing private counsel to assist in the prosecution is overruled (*Territory* v. *Chong Chak Lai,* 19 Haw. 437; *Territory* v. *Robello,* ante p. 7,) together with the exceptions to refusing a continuance of the two days to plead and denying the motion to discharge the defendants on the ground that the facts stated by the prosecution in its opening remarks to the jury would not constitute the offense charged.

Before referring to the exceptions to rulings upon evidence and instructions we will consider whether the evidence which went to the jury showed that the defendants had concerted together to secure higher wages for Japanese laborers by any of the unlawful methods charged in the complaint, for if there was such evidence the exception to the verdict and refusal of new trial could not be sustained unless there was prejudicial error in the rulings during the trial, in the absence of which the verdict would stand subject only to the motion in arrest of judgment. It is unnecessary to cite the numerous decisions that in determining whether a verdict is sustained by the evidence this court does not consider the sufficiency or credibility

of the evidence but merely its legal effect upon the question in issue, which, in this case, is whether the defendants had agreed upon the use by any of them of any of the unlawful methods for accomplishing their avowed object.

A criminal conspiracy, as defined by statute (Sec. 3091 R. L.), is "a malicious or fraudulent combination or mutual undertaking or concerting together of two or more" (1) "to commit any offense or" (2) "instigate any one thereto, or" (3) "charge any one therewith; or" (4) "to do what plainly and directly tends to excite or occasion offense, or" (5) "what is obviously and directly wrongfully injurious to another." Among the instances given in the statute is "a confederacy to commit murder, robbery, theft, burglary or any other offense provided for in the criminal code," including, among other examples, "to prevent another, by indirect and sinister means, from exercising his trade, and to impoverish him."

The charge against the defendants is sustainable by evidence that they combined or mutually undertook or concerted together to do any one or more of the things charged as the subject of their mutual undertaking, each of which is unlawful, and as it includes an undertaking to do "a wrong or injury to any person or persons or to the public" (Sec. 2703 R. L.) malice could be inferred from the nature of the contemplated wrong. Combining or mutually undertaking to do things in ways which may expose the confederates to the penalties of law is not usually done in the presence of witnesses or shown except by the conduct of the parties and by circumstantial evidence from which the mutual undertaking or combination or concerting together is inferred. Roscoe's Crim. Ev., 6 Ed., 383, 385. This is so generally acknowledged to be the law upon the subject that it is needless to cite decisions to that effect.

The following facts appear or could be inferred from the evidence, namely: The defendant Negoro, after returning in May, 1908, from studies at the University of California and

occupying himself in writing for the press, prepared in September of that year a plan for getting higher wages for those Japanese plantation laborers who worked by the month for Japanese who had planting contracts.   Sheba, editor of the Japanese newspaper, the Hawaii Shinpo of Honolulu, declined to publish the article on the ground that it was an inopportune time to stir up agitation on the subject among the laborers and that it would be better to make an effort to induce the planters themselves to advance the wages of this class of labor after certain questions affecting Cuban sugar and Japanese immigration were disposed of.   Negoro believed, however, that the time had come to arouse Japanese on the subject and that it was not fair that the contractors only were doing well or that those who worked for them could obtain good wages for efficiency, but that all should receive a higher monthly wage, requiring of course a higher wage for contractors as well.   The object of Negoro appears to have been to arouse discontent among laborers employed by contractors and then persuade them to demand and insist upon an increase of wages.   Being unable to induce Sheba to publish his article he got it published in the Nippu Jiji, a Honolulu newspaper edited by the defendant Soga, the defendants Tasaka and Negoro, according to one witness for the prosecution, although denied by them, being then or later on assistant editors.

The article, entitled "How about the Higher Wages," published in the Nippu Jiji of July 31, 1908, begins, "We regret that the wages in Hawaii are disproportionally low in comparison with the large profits," and presents an argument why the Japanese government should interpose, "for the Japanese Government is well aware that its subjects are not born to be slaves of the capitalists of Hawaii," saying: "Cane contractors (Japanese) are making profits and a large number of them are returning to Japan, thus diminishing the number of laborers." The prohibition of immigration to Hawaii," says the article,

"Is an act silently demanding higher wages and we endorse it;" adding: "The Japanese laborers who are placed in the position of slaves by reason of the prohibition of immigration to America do not have courage to ask for higher wages;" then going on to urge that the "Japanese Government, taking great courage itself, should request the American Government to dissolve the prohibition of emigration of Hawaiian Japanese to the Mainland. The time is ripe. Though the Hawaiian immigrants do not say it in so many words, it is their hope of years and their silent prayer that they recover the lost liberty of choosing and changing their place of abode, and become a full fledged man and to be in a position to earn a just reward for their labor."

But there is evidence that Negoro's plan soon assumed a somewhat different form. He testified (p. 585 Tr.) that at the time that Sheba declined his article he himself "was not very earnest;" but a few weeks after, while in the office of the Daily Chronicle (a Japanese newspaper in Honolulu), the higher wage question was discussed, "and I think I was the proposer. I said the wages is too low and we should have higher wages for the Japanese laborers," but Tsurushima "planted himself upon the contract system" and refused to "go into the movement or urge the movement," saying that the Japanese were "very much nowadays going into independent industries," many of them raising cane on contract and beginning to permanently reside in Hawaii; that this was "a very good tendency in order to encourage the people to get into independent trade," and "raising cane by contract is a very good opening for the Japanese laborers;" and that if wages of common laborers were increased to, say, $26, it would be more profitable than raising cane by contract and Japanese, in place of being cane contractors, would become a dependent class of laborers; therefore he opposed the higher wage movement. "I did not convince him," says Negoro, as he and also Sheba were "opposed in prin-

ciple to the high wage movement." After the publication of the first article the "Nippu Jiji continued to publish articles advocating higher wages" (p. 591), and a controversy on the subject was "bitterly waged" between the Shinpo and Jiji. About November 1 the Jiji issued an extra calling for a conference at the Asahi theatre which "was the very first meeting of any organized effort on the part of Japanese" and "the first thing that materialized or took shape of a movement." (p. 593.) Negoro thought Tasaka wrote the notice but was not sure. "Some one of us wrote it" (p. 595); there were thirteen or fourteen present at the meeting; no laborers; small merchants and hotel keepers, and the defendants Soga, Tasaka and Negoro. (p. 596.) It was proposed at the meeting to bring about a union of the four Japanese newspapers published in Honolulu, being the Shinpo, Jiu, Jiji and Chronicle. (p. 602.) One of the objects of the meeting was to "spread the higher wage sentiment among Japanese in these Islands by and through the efforts and assistance of the newspapers." (p. 606.) The next meeting (p. 607) was at Ishi's house about November 3, called in pursuance of a resolution at the theatre meeting to get the newspaper men together, and who were present at Ishi's house as well as all of the defendants. An altercation arose between Sheba and Makino, who came in late, on the ground that the latter was not a newspaper man. (p. 614.) Makino presided and proposed a mass meeting of Japanese. (p. 46.) A week later a second meeting was held at Ishi's house at which all the defendants were present (p. 621) with the representatives of the newspapers and of the merchants' association. Nothing further was done for about two weeks "except that the daily, the Nippu Jiji, was continuing to write articles on higher wages," when, about the middle of December, a meeting was called at the Japanese Y. M. C. A. building in Honolulu "with the purpose of coming to a definite plan for pushing this question further." (p. 627.) Makino was chairman of the meet-

ing; Negoro secretary, and all of the defendants were present. (Ev. of Harbottle p. 15). It was stated at this meeting that its purpose was "to consider the ways and method for securing higher wages for Japanese laborers on plantations" (Ib.); that the name for the organization formed that night, proposed by Negoro, was "So Kiu Kishi Kai," meaning "Higher Wage Consummation Association." After the name had been approved officers were elected (p. 86), Makino chairman; Negoro secretary, and "Yamashiro, if I remember rightly, treasurer." In Makino's speech he declared that they should get at things in "the spirit of old Japan," "yamado tomasi" (p. 14), meaning "the spirit that drives everybody away, no matter who the contestants may be. Whenever the Japanese go into a certain thing with a determined purpose of arriving—accomplishing a certain thing, they use that spirit, that yamado." (p. 27.) Negoro says that when the strike was got up, "We went there. The laborers formed higher wage associations but had no official connection with us," although "we agreed to assist it through." (p. 630). Although, as he claimed, the higher wage associations throughout the group had no official relations with each other their formation was in a way "caused by the Honolulu association." (p. 633). At the meeting at the Y. M. C. A. building the officers, Makino, Negoro and Yamashiro, were authorized to appoint a committee of twenty other members of the association, Negoro stating that the "way or method or system of securing higher wages was to be left entirely to the discretion" of the committee (p. 7); Tasaka saying, "We must do our best and in order to accomplish that purpose we must stick together" (p. 12), and Makino and Negoro urging that higher wages be secured "regardless of consequences." (p. 15).

We have referred in detail to the preliminary steps taken by the defendants for securing their avowed object for the evidence permits the finding that they combined and mutually undertook and concerted together to stir up Japanese laborers

by appeals to their patriotism and otherwise, as will be shown hereafter, first to demand an advance in wages and then to enforce the demand by the various means and methods enumerated in the complaint which were urged in the articles published in the Jiji which was the only newspaper which joined their plan and became the avowed and generally recognized organ of the defendants in their "righteous campaign for higher wages," as Negoro terms it. (p. 643.)

The contention of the defendants is that they are not responsible for, because they are not shown to have agreed upon, any of the Jiji articles which countenance or incite violence or any unlawful acts or which are of a nature tending to intimidate those who oppose striking or wish to return to work, and they insist that their constant protest against any unlawful acts is conclusive evidence that they did not approve them or agree upon using or inciting unlawful acts.

This contention, however, cannot be sustained. Under all the circumstances which could have been found by the jury it was the duty of the defendants who deprecated the Jiji articles or did not wish to identify themselves with their publication to say so, and the inference could properly be made that although all of them may not be criminally liable for the writing and publishing of the articles they adopted and used them as part of their "campaign;" and that they did this by mutual agreement, whether expressed or implied, is immaterial. Their urging that there be no violence or breach of the peace or anything unlawful done to incur the penalty of the law may or may not have been sincere. When Mark Anthony said to his audience, "Let me not stir you up to mutiny and rage," that was precisely what he meant to do and did do. The fact is that those who "sow the wind must reap the whirlwind," no matter how fervently they may have tried to avoid it. Urging or doing unlawful things is not condoned by urging that they be done lawfully.

There was evidence, admitted against defendants' objection, of letters addressed to Negoro by Japanese in different parts of the Territory applauding the course of the Jiji and urging violent methods for accomplishing the higher wage object. The objection made to the evidence was that it did not tend to show the defendants' agreement upon the violent courses recommended or that they had done or intended or agreed to do anything to suggest them. Evidence of serious assaults by the Japanese at Waipahu upon another Japanese and at Honouliuli was objected to also upon similar grounds. We think that the evidence was admissible in tending to show that the persons to whom the publications and speeches had been addressed or who had been reached by them were aroused thereby to urge the acts of violence and unlawful courses which they suggest.

There were papers taken from the office of the defendant Negoro without process of law and forcibly, including correspondence of the kind referred to and an outline of a plan by Negoro for a play, enacted by Japanese actors in Honolulu, which was regarded as depicting editor Sheba as a traitor and an objectionable person who ought to be exterminated. Defendants' claim that the evidence was inadmissible because illegally obtained is not sustained. *Commonwealth* v. *Acton,* 165 Mass. 11; *Commonwealth* v. *Smith,* 166 Mass. 370; *Adams* v. *New York,* 192 U. S. 585.

The evidence referred to, in connection with other evidence to be mentioned, permitted the inference by the jury that the defendants combined and concerted together to secure higher wages for a certain class of Japanese laborers and that in order to accomplish their common object they mutually undertook to arouse a feeling among the laborers which would induce them to strike and that as part of their mutual plan and undertaking they used the Jiji newspaper in furtherance of their common object to intimidate and threaten Japanese laborers opposed to striking as well as Japanese who tried to dissuade

Territory v. Soga, 20 Haw. 71.

laborers from quitting work, and also that in furtherance of and as part of their common plan the defendants combined to intimidate and threaten with violence and to incite assaults and batteries upon all Japanese laborers who kept on working and that they conspired by similar means to boycott financially and ostracize socially Japanese who refused to join in such indirect, sinister and unlawful methods and means for carrying out the defendants' plan, the object of which was to prevent the said corporations from exercising their trade and to impoverish them, unless the defendants' main object of enforcing an advance in wages should sooner or otherwise be accomplished.

The jurors as reasonable men could properly have found the following facts from the evidence and drawn from those facts the inferences below stated:

(1) The early history is outlined above of the movement to secure higher wages and the formation of the Higher Wage Consummation Association; (2) that all of the four defendants were regularly called upon by men on the Oahu plantations for speeches intended to stir up the laborers, and always responded, with one exception at a meeting at Ewa; (3) that Negoro drafted the outline of the play, which as presented was calculated to arouse bitter feeling and to incite violence against Sheba and others opposing the campaign for higher wages, and instructed the actors at rehearsal; (4) that all of the defendants were present at the production of the play and none protested against its suggestions of violence; (5) that Soga and Tasaka were admittedly editors of the Jiji; that Negoro was also an editor and that Makino knew of substantially all of the publications in the Jiji and approved of them; (6) that all of the defendants were promptly notified of the inflammatory letters received by the Jiji and yet made no attempt to inform their writers that they were misunderstanding the purport of the advice published in the Jiji; (7) that all of the defendants made speeches at Kahuku, and some of them at other places,

encouraging expulsion of the sycophants from the plantation; (8) that the word "bokumetsu," which is capable of meaning "exterminate," was used in some of the speeches to the laborers made by or in the hearing of the other defendants; (9) that all of the defendants knew at the time that Sheba feared for his life and had a body guard, and yet made no protest against the publications in the Jiji which were susceptible of being understood as encouraging and inciting assaults upon him; (10) that at a meeting of delegates held towards the end of the campaign, at which meeting all the defendants were present, it was unanimously voted to extend thanks to Soga for his efforts in the Jiji; (11) that one of the objects of the H. W. C. A., in the formation and maintenance of which all of the four defendants were active, was (Ex. A 22) "to establish branch offices in country districts" and that the associations formed in the country districts were closely affiliated with the association in Honolulu; (12) that another object of the H. W. C. A. was (Ex. A 22) to procure "men of Sogoro (martyr) type," that is, men willing to suffer and if necessary die for the advancement of the cause, to provide as a "plan of protection of Sogoro (martyr)," "to pay money, to provide work, to bail out, and to provide lawyer," and to engage lawyers and pay their fees "to defend officers of head office and directors, to give opinions, and to defend Sogoro (martyr) of country districts" and to pay "traveling expenses of lawyer and of interpreter;" (13) that a military system of pickets, passes, etc., was inaugurated and maintained during the strike, with the knowledge and approval of all of the defendants, for the purpose of preventing strikers from returning to work and of intimidating them and others who might otherwise be willing to accept employment on the plantations; (14) that letters intended for the H. W. C. A. were ordinarily addressed in the care of the Jiji, of which some were forwarded by Soga to the officers of the association and

some were not so forwarded, and that Makino and Negoro in advance agreed with Soga that the latter should in his discretion determine what letters to forward to them, and (15) that the Honolulu H. W. C. A. defended against all of the proceedings with reference to the strike and its incidents, except the prosecution against the assailants of Giichi of Ewa, and that Makino and Negoro were personally active in rendering assistance in the defense.

Extracts inserted here from translations of some of the Jiji articles and communications addressed to the Jiji and H. W. C. A. as received in evidence were capable of being understood by those for whom they were intended as inciting violence. So also are some of the replies to those articles and communications.

"There are in the plantations certain noxious insects called sycophants. They constantly disturb the peaceful relations of the planters and the laborers. · * * * So what we desire is that you who live on the plantations should exert yourselves in getting rid of the sycophants who are to be found here and there on the plantations * * * They are enemies to our laborers, they are traitors. * * * The strikes which have occurred have been the result of the base, malicious artifices of these sycophants. This is the third reason why they should be got rid of, why they should be destroyed."

"If they" (referring to Sheba and others) "go to extremes in vexing the laborers it is sure that they will not be allowed to die natural deaths" (literally, die on the mats or in their beds), "it is said." "On the point of death the best thing they can do is to prepare to die nobly, it is said."

"The conclusion which he" (a certain speaker at a mass meeting) "reached was thus stated: The 70,000 Japanese here must ever make that which is just and right their standard of action and must exterminate (bokumetsu) those Japanese who play the role of Russian spies, who resemble the worms that are found in the bodies of lions."

"Ignorant alike of duty and responsibility,
"Are you, the turf-born beast of a planter's dog.
"Sure it is you are the foe of 70,000 Japanese.

"Prepare to receive a shower of fists."

From "a song on the higher wage question:"

(4) "Reflect well on this, wages have not been increased up to today because of the existence of a mischievous pig and dog or pigs and dogs. * * * (7) These tame-looking, tail-wagging animals, the wild pig and the prairie dog, will fall into the hands of some hunter or other. (8) Throughout the eight islands of Hawaii there is not a single man who does not hate the dog and the pig because they prevent the rise of wages. (9) They cannot be left as they are now because when dogs and pigs are free to go where they please there is no saying when, where or whom they will bite. (10) As an ending of the affair this time, call together a few hunters and quickly slay the dog and the pig."

"The mad dog and the planter's dog" (there was evidence tending to show that these references were to Sheba) "should be beaten to death, it is said."

"As for the term Koken (planter's dog) one would like to reverse the order of the phonetic sounds and read them Kenko (knuckle bones) as the planter's dog ought to be given a dose of iron fists."

"Plantation laborers on each island, write out names of sycophants who persecute you and send it in to this office."

"It is said that the sycophants in the plantations must be expelled quickly."

"It is said that mad dog and planter's dog should be knocked to death."

"It is said that there is no fellow worth his salt who makes use of disloyal newspapers." "The rascals who do this will later on receive heavy blows, it is said."

From correspondence to the Jiji:

"But against those who oppose our action and who do not agree with our idea and purpose we must take proper steps; we must be ready for hammer of iron and shower (rain) of blood."

After referring to the Shinpo and the Chronicle, "We will never stop until we exterminate them though we risk our own life."

"We will strike the planter's dogs and pigs to the bottom of the hell at an earliest opportunity."

Territory v. Soga, 20 Haw. 71.

"The 70,000 will strike the planter's dogs and pigs into the pond of blood and to hell."

"Let us stamp out these brutes.   If we allow these creatures to remain in this society we do not know what trouble they may cause.   Therefore let us take the step as soon as possible."

"Are you not awake yet, you brutes?   If you oppose the Higher Wage Association we will try so that you cannot publish even a sheet of your paper.   There are not only moonshining night but on dark nights take care for I will fix you until you are crippled.   Do not forget."

"Oh how I wish to resort to violence.   When leaders like Mr. Ishii and Mr. Negoro lead the 70,000 strong men and go forward, what can we not accomplish.   These two men who are Oyama and Toga of Hawaii can rely on us and face the planters.   We will work under their command with the determination to die."

Referring to Sheba and another:   "On one of the vessels of the Volunteer Fleet there is a Japanese blade three feet in length clear and bright like autumn water or winter ice waiting to come down on the heads of these men.   At any moment it may come—perhaps when a leading article is being written. *   *   *   You had better prepare for the maintenance of the families you will leave behind you."

"The strikers of Aiea   *   *   *   have taken the precaution to obtain a good supply of bullets and provisions wherewith to oppose the planters."

"Now is the time to raise the fame of the land of the Rising Sun throughout the world.   Let the Sun Flag be dyed with blood and let the country be strengthened by the bones of the dead."

"If any one tries to obstruct our demand for our rights we can stamp them out for our just defense.   If peaceful method will not do it, though we have pity we must cut them into two with a sword."

Exceptions 4 and 5 as to the admissibility of Sheba's evidence of his own plan for raising wages as opposed to that of the defendants; 6 and 7—33 relating to the admissibility of the articles in the Jiji; 34 to the papers alleged to have been

illegally seized; 35, 41 and 47 as to communications to the Jiji and higher wage association tending to show that the language used in the Jiji articles was accepted literally by laborers; 36 relating to papers seized in Negoro's room; 37 and 38, refusal of cross-examination of editor Sheba as to his reasons for rejecting Negoro's article, and (40, 42 and 43) as to his using similar vituperative language in the Shinpo with that of the Jiji, the defendants being allowed a certain time within which to produce the Shinpo articles; 44, allowing evidence that the defendants had not objected to the Jiji articles; 45, 46 and 49, referring to the play in which the Shinpo and Jiu are mentioned as spies and the "opposers driven out of the meeting place," connected with evidence that Sheba as a spy was so realistically presented that the audience shouted, "Fix the planter's dog" (p. 392); 50, a leading question objected to; 52, 53 and 54 as to admissibility of evidence of an assault at the Ewa plantation upon a laborer who stayed at work after the strike was declared by the higher wage association of Ewa, the constitution of which shows its official connection with the Honolulu association; 55, 56 and 57 relating to a riot and imprisonment of police officers by strikers at Waipahu; 61 as to asking Negoro on cross-examination whether "all the gamblers, loafers, thugs and criminals in jail and out of jail are on your side, are they not?" and (62) if he remembered an article in the Jiji giving as one of the rules of the higher wage association in Hana to "refuse to subscribe to the Hawaii Shinpo;" all of these exceptions are overruled for in none of them does error appear, unless in 36, 38, 42 or 63 relating to cross-examination of Sheba, but if it was error thus to restrict cross-examination it would not justify setting aside the verdict.

Exceptions not presented or argued in the brief are presumably abandoned.

Defendants' exceptions were allowed to instructions 3, 4, 5, 6, 7, 8, 9, 10a, 10d, 10e, 11, 12, 13, 14, 15, 18, 19, 20, 21a

and 21b, but in their brief instructions 6, 9, 10a, 10d and 13 only are referred to, their objections being in substance that 6 and 9 were not predicated upon evidence; that 10a treated proof of acts done before an agreement was shown to do them; that 10d made each defendant responsible for the language and acts of the others and that 13 made acting together equivalent to conspiracy.

The following are the instructions:

"6.   In order to find that the defendants conspired to prevent the corporations named, or any of them from exercising their trade and to impoverish them it is not necessary that you should find that they contemplated a complete cessation of the work of the corporations or their complete impoverishment.   It is sufficient if the defendants conspired, by any of the unlawful means alleged, to prevent any of the corporations named from carrying on its business to the extent to which it otherwise would have done and to impair its income to that extent."

"9.   One person has no right to threaten another with violence even in a veiled or guarded manner; all language, however veiled or guarded, which is reasonably calculated to inspire in a person of reasonable firmness and courage a fear that personal violence is going to be used by the person making use of such language is unlawful, and any conspiracy to accomplish a purpose by intimidating another by such language is contrary to law."

"10a.   If you find from the evidence that the publication of intimidating and threatening articles in the Nippu Jiji constituted one of the unlawful means by which the alleged conspiracy was to be carried out, the fact that one or more of the defendants may not have been directly responsible for such publications would be no defense provided you further find that such defendants were parties to the conspiracy with those who were responsible for the publications; as when the conspiracy is once established the acts of any one conspirator in furtherance of the common design become the acts of all."

"10d.   The complaint charges that the defendants, in combining to accomplish their purpose, made use of certain unlawful means, among others that of 'intimidating and threatening violence against, and instigating others to intimidate and

threaten violence against' all Japanese who should attempt to persuade the laborers to continue to work, and against all Japanese laborers who should continue to work notwithstanding the strike."

"I instruct you, in this connection, that when a person or persons utter or publish threatening words concerning another, which, in their ordinary and common signification would amount to a threat of violence, or would instigate and incite others to intimidate and threaten violence against any person or persons, it must be presumed that the language so uttered or published was used in its ordinary sense, and so understood by those hearing or reading the same; and a defendant, when prosecuted for threatening violence, or instigating and inciting others to threaten violence against any person or persons, cannot excuse his guilty conduct by an explanation in his testimony that he did not use the words to convey the meaning thereby indicated, provided the jury believe from the evidence, beyond a reasonable doubt, that such defendant uttered or published language of this character."

"I instruct you, further, that one who employs certain language, spoken or published, which he knows will be understood by the hearer or reader as a threat of violence against any person, or as an encouragement to others to intimidate and threaten violence against any person, must be taken to have made the statement or publication in that sense. In other words, if one or more of these defendants made use of certain language, you will find that such defendant or defendants used such alleged language in the sense in which he or they knew those reading or hearing the same would take its meaning to be; and such language must be held to have been employed to express the meaning which those using the said language were aware that those reading or hearing the same would understand from it."

"13. While the law requires that, to find the defendants' guilty in this case, the evidence should show that they were acting in concert, still it is not necessary that it should be positively proved that they actually met together and agreed to do the acts charged in the complaint. Such concert of action may be proved from circumstances, and if, from the evidence, the jury believe beyond a reasonable doubt that the defendants acted together, each aiding in his own way, it would be sufficient."

The instructions excepted to correctly state the law.

The following citations are applicable to the case: *Queen* v. *Most,* L. R. 7 Q. B. 253, as to a newspaper article "naturally and reasonably intended to incite and encourage or to endeavor to persuade persons who should read that article" to commit crime; *Loewe* v. *Lawler,* 208 U. S. 274, illegality of boycott, and as to same and also picketing see *Beck* v. *Teamsters' Protective Union,* 118 Mich. 497, 518, 520; so *State* v. *Stewart,* 59 Vt. 273, and *State* v. *Ryan,* 82 Pac. (Or.) 705; 3 Wigmore's Ev. Sec. 1073 as to effect of unexplained possession of letters, and see cases cited in n. 2 Ib.; Wright on Crim. Conspiracies, Am. Cases, 212, as to circumstances which imply an agreement.

The exception to the denial of the motion in arrest of judgment, which in the regular order of pleading would follow the motion for a new trial, is now to be considered.

During the trial a juror was withdrawn by consent of the defendants and of the prosecution, the trial was continued and a verdict rendered by eleven jurors. The exception to the denial of the motion in arrest of judgment presents the question whether this was allowable under Art. 3 of the constitution, "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury," or the fifth amendment, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury" (indictments being triable by common law juries only), or the sixth amendment, "In all criminal prosecutions, the accused shall enjoy the right of a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed," or under Sec. 83 of the Organic Act, "No person shall be convicted in any criminal case except by unanimous verdict of the jury."

The defendants contend that they are charged in the complaint with conspiracy in the first degree since the acts of

violence and assaults and batteries which they are charged with
having conspired to instigate may include felonies, to instigate
which is by statute, Sec. 3099 R. L., a conspiracy in the first
degree punishable by imprisonment at hard labor not more
than ten years or by fine not exceeding $1000; hence, as they
claim, an indictment was requisite under the fifth amendment
requiring a trial by a common law jury of twelve jurors.   But
if an indictment had been presented describing the offense as
it is described in the complaint a sentence for conspiracy in the
first degree could not have been imposed since the essential
elements of the offense are not set forth with certainty and
particularly, and by Sec. 3101 R. L., "Conspiracy not appear-
ing to be in the first or second degree, is in the third degree,
and shall be punished by imprisonment at hard labor not ex-
ceeding one year and by fine not exceeding four hundred dol-
lars."   A felony is defined in Sec. 2702 R. L., as "An offense
that is punishable with death or with imprisonment for a long-
er period than one year," and "Every offense not a felony is a
misdemeanor."   Ib.   The complaint does not charge a statu-
tory felony punishable by imprisonment for more than one
year unless the authorized sentence of one year's imprisonment
and $500 fine is to be regarded as imprisonment for more than
one year because of the statutory requirement, Secs. 2887 and
2888 R. L., as amended by Act 33 S. L. 1905, that in case of
nonpayment of fine and costs the convicted person "shall be
committed to prison there to remain at hard labor or otherwise
in the discretion of the court or magistrate until such judg-
ment is satisfied," which is followed by a provision that hard
labor shall not be imposed in misdemeanors and that after im-
prisonment for one year any person convicted may be dis-
charged by order of any circuit judge by proof that he has not
since his conviction had any estate out of which he should have
satisfied such judgment, and with a further proviso "that such
imprisonment, together with any other imprisonment that may

Territory v. Soga, 20 Haw. 71.

have been imposed by the same sentence, shall not in any case of misdemeanor extend beyond the term of one year," and that the time of such additional imprisonment shall be deemed to discharge the fine and costs at the rate of $1 a day.

We are of the opinion that the statutory definition of a felony refers solely to the imprisonment which may be imposed by the court and not to the imprisonment resulting in cases of non-payment of fine and costs. The case therefore did not require indictment as the offense charged is neither a statutory nor a common law felony, nor is it an infamous offense either in its nature or by reason of the kind of punishment which may be imposed. In *Callan* v. *Wilson,* 127 U. S. 540, a conspiracy to boycott was held to be a serious misdemeanor requiring a trial by jury in the first instance and not on appeal only. In that case there was no statute authorizing the waiver of a jury. Unlike the case at bar, the defendant demanded and was refused a jury trial in the first instance. Whether at the trial of such a misdemeanor a juror can under the third article or sixth amendment be withdrawn by consent of the accused, is a question which was fully considered in the leading case of *Commonwealth* v. *Dailey,* 12 Cush. 80, in which it was held that a waiver of jury to that extent was not in conflict with constitutional provisions, Chief Justice Shaw saying: "The precise question presented to us in this case is, whether a party on trial, charged with a misdemeanor, when a juror was necessarily withdrawn during the trial, and by the consent and request of counsel on the part both of the commonwealth and the accused, it was proposed and consented to, that the trial should proceed with eleven jurors, a judgment can be rendered on the verdict," and concluded as follows: "Under the circumstances of the case, the court are of opinion, that on the trial of a conspiracy, supposing it an irregularity to take the verdict of eleven jurors without the consent of both parties, yet as it did not affect the jurisdiction of the court, the exception was one

that the accused might waive; that having stipulated of record, that he would take no exception to such irregularity, he is now precluded from taking it, and therefore that the verdict must stand." (p. 84.)

In *Thompson* v. *Utah,* 170 U. S., 343, the defendant, who had been indicted for grand larceny and convicted by a jury of twelve persons while Utah was a Territory, obtained a new trial which was not heard until after Utah became a State. At the second trial the defendant was again found guilty, the jury in accordance with the constitution of the State of Utah consisting of eight jurors. He moved for a new trial upon the ground among others that the jury was composed of only eight jurors, whereas the law at the time of the commission of the alleged offense required a jury of twelve persons. The supreme court (p. 349), assuming "that the provisions of the Constitution relating to trials for crimes and to criminal prosecutions apply to the Territories," held (p. 353), "The law in force, when this crime was committed, did not permit any tribunal to deprive him of his liberty, except one constituted of a court and a jury of twelve persons," and "in respect of such crimes, the Constitution of the United States gave the accused, at the time of the commission of his offense, the right to be tried by a jury of twelve persons, and made it impossible to deprive him of his liberty except by the unanimous verdict of such a jury."

In *Schick* v. *U. S.,* 195 U. S. 65, the defendant was charged by information with having purchased and received for sale certain oleomargarin which had not been stamped according to law, waived jury and agreed to submit the issue to the court, pleading not guilty. The defendant claimed that the Oleomargarin Act was not constitutional. The court found him guilty and sentenced him to a fine of $50 and costs, saying, "When there is no constitutional or statutory mandate and no public policy prohibiting, an accused may waive any privilege which

he is given the right to enjoy. Authorities in the state courts are in harmony with this thought," and this although Mr. Justice Harlin in his dissenting opinion insisted that the requirement that all crimes shall be tried by jury furnishes an inflexible rule that may not be ignored in cases of felony and disregarded altogether in a trial for a misdemeanor even though the defendant consents to be tried by the court without a jury.

The decision in *Commonwealth* v. *Dailey*, 12 Cush. 80, was followed in several well considered cases. *State* v. *Sackett*, 39 Minn. 69; *State* v. *Wells*, 69 Kan. 792; *State* v. *Kaufman*, 51 Ia. 578. Our statute, Sec. 2820 R. L., provides that "The defendant in any criminal case less than felony may with consent of the court waive the right to a trial by jury," and that upon such waiver the case "may be tried by the court without a jury." If the entire jury may be waived in the trial of a misdemeanor it would seem to follow that the defendants could waive the legal number of jurors by consent of the court and that in such case the remaining jurors and not the court could continue with the trial and render a verdict.

The circuit court had jurisdiction of this offense. The defendants, although entitled to a trial by the full legal number of jurors, were impliedly authorized by statute to consent to the withdrawal of a juror and were not thereby deprived of their right, thus voluntarily waived, of trial by a common law jury. As to the publicity of trial and right of the public to have such cases tried by jury before tribunals established by law, there is no difficulty presented by the course which was taken. We think that the law laid down in *Commonwealth* v. *Dailey*, supra, applies in this case and that the defendants have been deprived of no constitutional rights. It follows that they also have not been deprived of treaty rights or of the right to equal protection of the law under the fourteenth amendment.

Exceptions overruled.

*S. M. Ballou (Kinney, Ballou, Prosser & Anderson, Lorrin*

*Andrews and E. W. Sutton, Deputies Attorney General,* with him on the brief) for the Territory.

*J. Lightfoot* for defendants.