## THOMPSON v. UNITED STATES.

(Circuit Court of Appeals, First Circuit.    January 9, 1906.)

No. 596.

1. CRIMINAL LAW—PROOF OF MOTIVE—EVIDENCE TENDING TO SHOW OTHER OFFENSES.

The fact that evidence introduced to show motive in a criminal case also has a tendency to show the commission by defendant of other crimes does not render it inadmissible, if otherwise competent.

[Ed. Note.—For cases in point, see vol. 14, Cent. Dig. Criminal Law, § 823.]

2. SAME.

On the trial of a defendant charged with counterfeiting bank notes in connection with another person, such person testified that prior to the making of the notes defendant stated to him that, on account of his business, he was liable to be arrested for abortion, and desired the notes to deposit as bail in case of such arrest. *Held*, that such evidence was competent on the question of motive.

[Ed. Note.—For cases in point, see vol. 14, Cent. Dig. Criminal Law, § 823.]

3. INDICTMENT—ISSUES—PROOF OF ALIAS.

Where a defendant was charged in the indictment under an alias, and was arraigned under both names and entered a general plea of not guilty, it was competent for the government to prove that he assumed the other name as alleged.

4. CRIMINAL LAW—REVIEW—HARMLESS ERROR.

Where a witness identified a person then in court as one about whom she had testified, the fact that she was permitted to state his name, which she had learned in the ordinary way by hearsay since the transaction, was without prejudice to defendant, even if error.

5. WITNESSES—CROSS-EXAMINATION OF DEFENDANT.

Where the cross-examination of a defendant in a criminal case was relevant to other testimony introduced to show motive, it was not improper because it related to matters collateral to the issue.

6. SAME—IMPEACHMENT—COMPETENCY OF EVIDENCE.

A statement made by the district attorney to the court in asking leniency in the sentence of a person previously convicted, and who was to be a witness for the government in a subsequent case, is not competent evidence in such case to impeach the credibilty of the witness.

In Error to the Circuit Court of the United States for the District of Massachusetts.

Thomas W. Proctor (Nason & Proctor, on the brief), for plaintiff in error.

William H. Lewis, Asst. U. S. Atty. (Melvin O. Adams, U. S. Atty., on the brief).

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

ALDRICH, District Judge.   The plaintiff in error, Robert Thompson, was tried upon an indictment with several counts charging him in various ways with violating the provisions of section 5415 of the Revised Statutes [U. S. Comp. St. 1901, p. 3662], in respect to coun-

terfeiting or imitating the circulating notes of banking associations acting under the laws of the United States. Some of the counts charged him with falsely making, others with unlawfully causing and procuring to be falsely made, and others with unlawfully aiding and assisting one Fred B. Wilson. The record presents a large number of assignments of error; but in argument the principal discussion centered upon the assignments which direct themselves against the remark of the government's attorney in opening, and the evidence upon the same point, which tended to show that the defendant, who was being tried upon a charge of counterfeiting, was an abortionist. It is particularly urged that the statement of the government's attorney that "Dr. Thompson, alias Dr. Seidell, Charles H. Roberts and J. R. Brown, Jr., we shall show, was engaged in the business of an abortionist," was unwarrantable and highly prejudicial.

We must approach the consideration of the question presented by the assignment which is based upon this statement with the idea that it was a rather abrupt way of opening the case to the jury. Still we must not be unmindful of what followed by way of explanation of the statement of the attorney, and as a statement of the ground for it, because it is apparent that the purpose was to point out what the government expected to prove, and that the person charged with counterfeiting had a motive for procuring spurious notes, and that such motive sprang from the fact that he was in danger by reason of the character of his business, and that he would be safeguarded in case of detection if he could have a hundred $100 bills to put up for bail; and it was further explained that it would save bother, and as the paper would not go into circulation nobody would be harmed. At the close of the government's opening the defendant requested the court to take the case from the jury, because the prosecuting attorney had stated, in the presence of the jury, that the defendant was an abortionist. The learned judge declined to do that, but in language as forcible as could be employed told the jury that the fact whether he was engaged in the business of an abortionist was of itself of no consequence, and had no bearing on the question of the defendant's guilt or innocence of the crime with which he was charged—that of counterfeiting. It was further said, reiterating that it had no relevancy, standing as an independent fact, that "whether it may appear in evidence, by reason of its connection in some other conversation, something about the defendant's business, I do not know, and you need not concern yourselves at all until the question arises."

An exception was taken to the failure of the court to take the case from the jury, and it was allowed provisionally; that is to say, "if the ruling be a matter of exception." We understand this to mean that the exception was taken, if it does not relate fairly to matter within the final discretion of the trial court. It is quite evident that the presiding judge understood that the purpose of the government's attorney was to give notice that he should offer evidence tending to show motive, and as we hold further on that it is competent for the government to introduce proofs tending to show a defendant guilty of other crimes, though of a different nature, when such proofs tend to

show a motive for committing the offense for which he is being tried, it is quite unnecessary to determine whether the statement was prejudicial, or whether the ruling was one within the final discretion of the court below. This follows logically enough upon the reasoning that it be competent to introduce proofs of a motive, though such proofs tend to show the commission of other crimes, it is none the less competent because prejudicial to the defendant upon the ultimate fact of guilt or innocence in respect to the offense for which he is being tried. The very purpose of showing a motive is to influence the jury upon the question of the defendant's guilt in respect to the offense with which he is charged, and, if it is competent to introduce the proofs, it is proper to state in opening that such proofs will be offered. So it is only necessary to determine whether under the peculiar circumstances of this case it was competent to introduce evidence which tended to show that Dr. Thompson was engaged in the business of an abortionist; it being in the nature of evidence of statements by the defendant himself as to the character and hazard of his business, and as to why he wanted counterfeit notes for his protection in case of arrest.

There is no occasion to question the general rule which excludes evidence of collateral offenses. Such rule is often called "the rule of logic," because it is based upon the idea that evidence of the commission of one crime in and of itself has no legitimate tendency to prove the commission of another crime. This general rule in practice is, of course, more absolute when the offenses are of a different nature. It is, however, subject to many exceptions, and the exceptions are rested upon various grounds. Under the exceptions to the general rule of exclusion it is only in rare instances that evidence of the independent fact of collateral crime is received for the purpose of showing that a defendant is in fact guilty of such collateral crime. Such evidence is ordinarily admitted for the purpose of showing a situation, or surroundings, which create a motive for committing the offense for which he is being tried; and it is the fact of the motive, and not the fact of guilt in respect to the collateral crime, which constitutes the essence and force of the evidence, and that is what the jury may weigh upon the question of the innocence or guilt of the party before them in respect to the offense with which he is charged in the indictment.

It is unnecessary to consider the various exceptions to the general rule of exclusion, for it is evident that the proofs tending to show that the defendant was an abortionist were admitted for the purpose of showing, not the collateral crime as a fact, but for the sole purpose of showing a situation which furnished a motive for committing the particular offense with which he was charged and for which he was being tried. Therefore it is only material to determine whether the evidence admitted, which had reference to the defendant's business and what he said about it, was competent for the purpose of showing a motive for the crime charged, though it also had a tendency to show that the defendant was guilty of other crimes, and crimes of a character which placed upon him the burden of the odium naturally and necessarily resulting from evidence of indulgence in pernicious practices.

One Fred B. Wilson, with whom it is claimed Dr. Thompson co-operated in creating a spurious paper, testified in substance, among other things, that Thompson asked whether he could copy a certain engraving, and that he gave him a $5 bank note, asking him to experiment to see if he could bring out all the details and make everything sharp, clear, and plain; that he wanted to make a test to see if the engraving could be copied and made certain; if it could, he would obtain an outfit; that a copy was made and submitted to Thompson, who examined it with a magnifying glass. Wilson also testified that at another time Thompson said it would be a mighty nice thing for him if he could have 100 $100 bills photographed and nicely finished to keep in his safe, to be used in case of an emergency, so that, if he had trouble, and it became necessary for him to furnish bail, he could take the amount from this package of bills and deposit it with the bail commissioner, and that Thompson further explained the emergency for which he might use these bills by saying there might some trouble come up in his line of business, that he might be arrested, and might require bail and might have to give bonds. This evidence tended to show that the defendant gave a reason for having the spurious paper made. The motive resided in the reason which he gave, and, for purposes of explanation of the emergency and of the reasons given in the conversation, the witness was permitted to state what Dr. Thompson said the business· was to which he referred in the conversation about which the witness was testifying; and, though the witness did say that he testified from his own knowledge, he in the same breath negatived the idea that he was in fact testifying from his own knowledge, as will be seen by reference to his exact words, which were, "My own knowledge and I took it from his mouth," and then, after a remark by the court that a statement by the defendant is competent, the witness, in reply to a question as to the defendant's business to which he referred in the conversation under consideration, answered "an abortionist."

The record upon this phase of the trial is somewhat confused. Enough appears, however, to make it certain that the witness was not in fact undertaking to testify from personal knowledge of Dr. Thompson's business, and that what he meant was that he was testifying as to his own knowledge of what Dr. Thompson said about it, Such is not an unusual characterization or form of expression by witnesses not acquainted with legal discriminations. It is apparent that the witness was not in fact testifying to what he knew about the defendant's business, but was testifying about what the defendant had told him concerning it.

There is no occasion here for us to decide whether it is probable that Dr. Thompson said in so many words that he was an abortionist. Such a question might reasonably enough address itself to the jury. Here the only function is to inquire whether it was competent for the government to show that the defendant said he was an abortionist, that he was liable to be detected and arrested, and that he wanted the spurious paper in question to use as bail in an emergency: Re-

144 F.—2

lieving the situation from all needless confusion, and to state the point in simple form, if Wilson's story is to be believed, and that was for the jury, the defendant himself, before committing the offense alleged against him, stated his motive for causing the spurious paper to be made. Therefore was it competent to put his statement of the motive for the commission of the offense with which he was charged before the jury, though it tended to show that he was guilty of other crimes?

Warrantable proofs of other criminal acts for the purpose of establishing a motive for committing the crime charged have sometimes been divided into two classes: First, proofs as to different criminal acts which are explainable as results of the same motive; and, second, proofs of other and independent criminal acts which in and of themselves form the motive for committing the crime alleged against the party and for which he is being tried. The case at bar is unquestionably in the second class. Here the motive for the crime in question sprang from the hazard involved in the defendant's practice as described by himself. There can be no question about this, if the witness Wilson is to be believed, and with that we have nothing to do.

In the sense of the criminal law, motive has been well enough described as "that which leads or tempts the mind to indulge in a criminal act," and it is something that may be resorted to as a legitimate help in arriving at the ultimate act in question. In the English case of Rex v. Clewes (4 C. & P. 221, 19 E. C. L. 354), Clewes was on trial for the murder of Richard Hemmings, and the prosecution was permitted to show that the defendant employed Hemmings to murder a Mr. Parker. This was sustained upon the ground that such fact and such knowledge of Hemmings furnished a motive for Hemmings' destruction by the defendant; the object being to prevent discovery of his own guilt. In Moore v. United States, 150 U. S. 57, 14 Sup. Ct. 26, 37 L. Ed. 996, Moore was on trial for the murder of Charles Palmer; and the government was permitted to introduce evidence tending to show that Palmer was investigating the circumstances of the death of one Camp, whom the defendant was suspected of having murdered. The competency of such evidence was sustained upon the ground of motive, and the Supreme Court, citing 1 Greenl. Ev. § 3; Farris v. People, 129 Ill. 521, 21 N. E. 821, 4 L. R. A. 582, 16 Am. St. Rep. 283; People v. Harris, 136 N. Y. 423, 33 N. E. 65, said:

"The fact that the testimony also had a tendency to show that defendant had been guilty of Camp's murder would not be sufficient to exclude it, if it were otherwise competent."

See, also, Wigmore on Ev. vol. 1, § 210 (which contains numerous and valuable extracts from cases relating to proof of collateral crime); People v. Pool, 27 Cal. 572, 576; State v. Pancoast (N. D.) 67 N. W. 1052, 1060, 35 L. R. A. 518; Kunde v. State, 22 Tex. App. 65, 3 S. W. 325; Blackwell v. State, 29 Tex. App. 194, 15 S. W. 597; Hamblin v. State, 41 Tex. Cr. R. 135, 50 S. W. 1019, 51 S. W. 1111; State v. Morgan, 22 Utah, 162, 61 Pac. 527; Am. & Eng. Ency. of Law, vol. 23 (2d Ed.) 253, 254.

In criminal trials, under a proper administration of the rule, which

in certain circumstances permits the introduction of proof of other crimes, particulars of the collateral crimes would generally, if not always, be excluded. The government did not resort to such proofs in this case. It was only sought to introduce in a general way the defendant's statements as to why he wanted the spurious paper and why he became a party to the offense charged. In accordance with the expressions in the English case (Rex v. Clewes, supra), that it was only proper to consider the evidence respecting the murder of Parker, so far as it tended to show motive and that the prisoner was guilty of the murder of Richard Hemmings, the trial judge pointed out to the jury that the independent fact of the collateral crime was of no consequence, that questions relating to the guilt or innocence in respect to matters connected with the defendant's business were wholly immaterial, and the jury was carefully admonished to consider it only in connection with the defendant's statements in the conversation about which the witness testified.

The conversation referred to tended to show the reasons given by the defendant for taking part in the acts for which he was being tried, and the defendant's business as explained by himself so connected itself with the offense charged as to render his own account of it relevant, and therefore competent and material upon the ground that it tended to show a cause which operated upon his will and induced the criminal acts complained of. Boyd v. United States, 142 U. S. 450, 12 Sup. Ct. 292, 35 L. Ed. 1077, is not deemed applicable to the situation here, for the reason that the collateral crime in that case in no way connected itself with the offense for which the prisoner was there being charged.

The defendant here was charged in the indictment under an alias, and the government introduced evidence to show that the defendant assumed another name as alleged in the indictment. No point is taken that the assumption of the false name was remote from the transaction in question, nor is the point taken that it is not ordinarily competent and material to prove the alias as alleged. The only question made was that it was rendered unnecessary by the fact that the defendant had been arraigned and had pleaded not guilty. The record discloses that the defendant was arraigned as well under the alias as that of the name of Thompson, and there is nothing in the general plea of not guilty which would deprive the government of the right, or relieve it of the necessity, if such necessity exists, of proving the names as alleged.

A witness by the name of Bogart, who identified a spurious note as one passed to her by a person whose name at the time she did not know, but whom she identified as a person then in court, and whose name was in fact Gallagher, and whose name since the reception of the note she had come to know, as the names of persons are known, was permitted to state that his name was Gallagher. Without elaborating the question much, this would seem to be competent; for, where the name is sought to be proved by witnesses rather than by records, knowledge of names to all persons who were not at the christening is grounded upon hearsay, or what people call a person in the community

in which he is known. At all events, knowledge of the name by which the person is generally known is of sufficient reliability to be put in evidence upon the question of name, when such question is material. The fact that the person who passed the spurious note was in court and identified by the witness clearly distinguishes the incident from that involved in Hopt v. Utah, 110 U. S. 574, 4 Sup. Ct. 202, 28 L. Ed. 262. But, however this may be, it being material to show that the spurious note was passed by Gallagher, and there being a man in court who was pointed out by the witness as sitting at the lawyers' table, who stood up in response to the question, "Will you stand up, Mr. Gallagher?" and who while standing was identified by the witness as the man who passed the spurious paper, and whose name was in no way challenged or questioned, and about whose name there was in fact no issue or dispute—it cannot be said that the defendant was harmed because of the witness' answer, whether it was technically admissible or not, and, if it were to be held technically inadmissible in the particular form in which it was admitted, the exception would be overruled as involving harmless matter and harmless error.

The defendant, being upon the stand, was cross-examined about his business involving matter which would ordinarily be collateral to the offense with which he was charged, and certain of the defendant's acknowledged business advertisements and certain letters were read to the jury. No point was taken that the cross-examination called out things not germane to the subject-matter of the direct examination, and if such point had been taken it would only have involved a question of discretion. The objection goes only to the substance of the matter introduced. It is not an unusual thing to cross-examine a witness on collateral and irrelevant matters to test his credit and to show his accuracy, interest, or bias; and the extent to which such an examination shall go is ordinarily a matter to be determined by the discretion of the trial court. But in this instance the evident purpose was not to do that, but to characterize the business to which the defendant had himself referred in his conversation with Wilson, and to explain the business which he pointed out in such conversation as hazardous, and in relation to which he wished to be safeguarded by the spurious notes in question. This being so, it became cross-examination upon relevant, though collateral, matter, because it related to the motive, and it was therefore proper to read the defendant's acknowledged advertisements about his business. After this was done the trial judge in the charge cautioned the jury, in strong and adequate language, that the character of the defendant's business should only be considered in connection with the conversation with Wilson in which the defendant gave his reasons for wanting the spurious notes in question. This consideration the government was entitled to, in order that the evidence in respect to the motive should be fairly weighed, and beyond this the jury was duly cautioned not to go.

A further exception relates to certain letters of recommendation from the defendant to Wilson, and what the defendant said about them on cross-examination. The answers of the witness in this respect and the letters themselves related to irrelevant and immaterial

matter, but we cannot see that the defendant was harmed by what occurred. The letters were not sufficiently contradictory to be harmful. They had no real substance as contradictory matter. They were only such indorsements as an ordinary friend might write in the perfunctory way in which such things go nowadays.

The defendant excepted because the witness Murphy was not permitted to testify as to an alleged statement of the government's attorney to the court in respect to favorable consideration of sentence to be imposed upon Wilson, who was to be a witness for the government. Proof of such a statement would not have been competent substantive evidence upon any issue before the jury. It could only weigh upon the question of the credit to be given to Wilson as a witness. There was no suggestion that the witness Wilson heard the statement, and if it were assumed that evidence of such a statement would be competent, if the witness heard it, still in a case like this, where no claim is made that the witness knew of the suggestion to the court, it would clearly not be competent. Ordinarily, if not always, such collateral matter comes in on cross-examination of the witness to the end that the jury may judge as to what weight, if any, it is entitled to in the direction of impairing his credit.

Witness Dunbar, subject to exception, was permitted to testify that he sold to Lena Thompson, the defendant's wife, certain sheets of Ward's bond paper. It was within three months of the alleged offense, and so far as the question of remoteness in point of time is concerned it involves discretion not to be reviewed here. Such evidence would not stand alone as competent proof of the disconnected and independent transaction. As such it would be wholly immaterial and irrelevant, but the transaction was connected with the defendant in such a way as to make it relevant matter, and evidence of it admissible, because, according to other testimony, the defendant himself furnished Ward's bond paper to Wilson from which the spurious notes were made, and said that his wife had a lady friend who had a gentleman friend that was a clerk at Ward's, and through that combination he had obtained the paper without any notoriety.

The witness Ellis was called to identify the paper of one of the spurious notes as Ward's bond paper. The witness did not undertake to testify as an expert, but to identify it by certain marks. The point in respect to this is not seriously urged, and we see no reason why it was not proper for the witness to state what he did, and to call the attention of the jury to the marks by which he claimed to identify the paper.

It is not deemed necessary to deal with the minor exceptions not urged by the defendant upon the brief or in argument as involving error further than to say that nothing is discovered which would warrant disturbing the judgment below.

The judgment of the Circuit Court is affirmed.