GEARS *v.* STATE OF INDIANA.

[No. 25,154.   Filed March 29, 1932.]

*Oscar Lanphar* and *W. D. Hardy,* for appellant.

*Arthur L. Gilliom,* Attorney-General, and *Edward J. Lennon, Jr.,* Deputy Attorney-General, for the State.

TREANOR, J.—Appellant was charged by affidavit, filed in the Gibson Circuit Court, with the offense of grand larceny, the substance of the charge being that, on July 3, 1925, the defendant did unlawfully and feloniously take, steal and carry away of the personal goods and chattels of one John Schmidt 50 chickens of the value of $60. There was a jury trial, and the jury returned a verdict of guilty. Upon the verdict, judgment was entered sentencing appellant to the Indiana State Prison for not less than one nor more than 14 years, and assessing a fine of $100, and disfranchising him for a period of one year.

Appellant assigns as error the overruling of his motion for a new trial. In support of his motion for a new trial, the appellant specifies 50 causes. In his brief, only 42 causes are set out, and these causes are reduced under "Points and Authorities" to seven propositions. Our discussion will center around these propositions, but will not follow the order in which they are presented.

Appellant's first proposition goes to the question of the sufficiency of the evidence to support the verdict. We shall postpone consideration of this until we shall have disposed of propositions two and three, which present questions of admissibility of certain evidence.

Appellant's second proposition is as follows: "Having admitted evidence of theft of chickens on July 3, 1925, as charged in cause No. 25,154 . . . it was error to admit evidence of distinct and separate crimes at other times." In support of this proposition, the appellant urges that "the proof of other offenses or

occurrences of similar nature is permissible only where the motive, intent or guilty knowledge of the defendant is in issue, or perhaps to identify the defendant." In *Zimmerman* v. *State* (1921), 190 Ind. 537, 130 N. E. 235, 237, Myers, J., speaking for this court, after recognizing the general rule that "evidence of the commission of entirely separate and distinct offenses cannot be received for the purpose of showing a disposition to commit the crime charged, or that the accused probably committed it," stated, as equally well established, the following proposition:

"But to this rule, from necessity to aid in the detection and punishment of crime, there are many exceptions as firmly fixed as the rule itself. To state the exceptions generally it can be said that, when the act constituting the crime has been established, then any evidence tending to show motive, intent or guilty knowledge, if in issue, or evidence which directly or as a natural sequence tends to show the defendant guilty of the crime charged, is competent, although it also tends to show him guilty of another and distinct offense. *Frazier* v. *State* (1893), 135 Ind. 38, 34 N. E. 817; *Clevenger* v. *State* (1919), 188 Ind. 592, 125 N. E. 41; *Underhill* v. *State,* *People* v. *Thau* (1916), 219 N. Y. 39, 113 N. E. 556, 3 A. L. R. 1537; *Thompson* v. *United States* (1906), 144 Fed. 14, 16, 75 C. C. A. 172, 7 Ann. Cas. 62; *State* v. *O'Donnell* (1900), 36 Ore. 222, 61 Pac. 892."

The opinion also quotes from *People* v. *Molineaux* (1901), 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193, to the point that evidence of other crimes is admissible when "it tends to establish . . . (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial."

The foregoing propositions are supported both by rea-

son and authority. (See cases and annotations in 3 A. L. R. pp. 1535, 1537, 1540; 27 A. L. R. 351, 357; 63 A. L. R. 595, 602.) The subject of admissibility of evidence of other offenses was discussed at length in the Ohio case of *Whiteman* v. *State* (1928), 119 Ohio St. 285, 164 N. E. 51, 63 A. L. R. 595. The following excerpts are from that case:

"In its last analysis the problem is one of relevancy. In all cases, civil and criminal, evidence must be confined to the point in issue and must be relevant to the issue," etc.

"The mere fact that testimony is logically relevant does not in all cases make it admissible. It must also be legally relevant. A fact which in connection with other facts renders probable the existence of a fact in issue may still be rejected, if in the opinion of the judge and under the circumstances of the case it is considered essentially misleading or too remote. The problem in the instant case is to determine whether the testimony of other offenses is too remote, or whether it is more likely to mislead and bring about the conviction of the defendants because of their participation in other crimes, rather than because of their participation in the crime charged in the indictment."

There is no reason why a court should admit evidence of offenses that are entirely unrelated to the offense for which a defendant is on trial. But we have a different problem when the relation which exists between other offenses and the one under investigation is such that evidence of defendant's participation in the other offenses is also evidence tending to show that defendant is guilty of the offense charged.

"It is only on rare occasions that proof of the commission of another crime by a defendant is either necessary or helpful towards establishing the crime with which he is charged. Hence, the evidence is ordinarily

irrelevant, while at the same time its admission would necessarily operate to so prejudice a jury against a defendant as that in a doubtful case it might control the verdict. . . . . But it has never been held by any court of responsible authority that the People cannot prove the facts constituting another crime, when those facts also tend to establish that the defendant committed the crime for which he is on trial. Such a holding would accomplish the absurd result of permitting a rule intended to prevent a defendant from being prejudiced in the eyes of the jury because of his life of crime to so operate in certain cases as to prevent the People from proving the facts necessary to convict him of the crime charged." Parker, C. J., in *People* v. *Molineaux* (p. 340), *supra.*

We consider that this court has adopted, and correctly so, the rule that evidence of the commission of other offenses is admissible, not only to negative an innocent intent, but also to prove that the defendant committed the act constituting the crime with which he is charged; and this evidence is admissible for the latter purpose either because it tends to identify the defendant as the perpetrator of the offense or because it shows a scheme or plan on the part of the defendant to commit a series of offenses one of which is the offense in question. The admissibility of the evidence relating to other offenses presents a question for the sound discretion of the trial court, guided only by very general standards or tests. Wigmore, in his treatise on evidence, states, as an axiom of the law of evidence that "all facts having rational probative value are admissible, unless some specific rule forbids," that in our system of evidence, the rules of exclusion are, in their ultimate relation, rules of exception to a general admissibility of all that is rational and probative. The learned

author explains that this principle does not mean that everything that has probative value is admissible; but that "the true meaning is that everything having a probative value is *ipso facto* entitled to be assumed to be admissible, and that, therefore, any rule of policy which may be valid to exclude it is a superadded and abnormal rule"; and that "these rules of policy appear as merely so many reserved spaces in the vast territory of logically probative material." Wigmore, Evidence, §10. In the instant case, the evidence of other offenses and of circumstances connected therewith, when considered in the light of the circumstances of the offense with which the defendant was charged, substantially tended to identify the defendant as the perpetrator of the crime charged, and also to show a scheme or plan to commit a series of acts of larceny which included the crime charged. (See discussion of the evidence, *infra*.) The evidence was not merely logically relevant, but was legally relevant, and the trial court properly admitted it.

Appellant's third proposition is as follows: "Appellant was arrested without a warrant, for a misdemeanor, not committed within the presence of the officers, on the night of July 11th, and thereupon searched and his body examined, and it was prejudicial error to admit evidence of what was disclosed by this search and examination."

Appellant assumes as the basis of the foregoing proposition that he was under illegal arrest at the time of the "search and examination." The record discloses that appellant was taken into custody by the police of Evansville, Indiana, about midnight of July 11, and without a warrant. On Sunday, July 12, two officers from Gibson County went to Evansville and brought appellant to Somerville in Gibson County. The evidence shows that one of these officers, the sheriff of Gibson County, was acting under a warrant issued upon an affidavit charging

a misdemeanor; that appellant was brought to Somer-
ville under the authority of this warrant and was being
held under it at the time of the examination and search.
Even if it be granted that the appellant was under
illegal restraint while being held by the Evansville
police, such fact would not taint with illegality the sub-
sequent detention, under a legal warrant, by the sheriff
of Gibson County. We conclude that the appellant was
under a legal arrest at the time of the "search and ex-
amination," and that the evidence obtained thereby was
admissible.

We shall now consider appellant's first proposition,
which is as follows: "The evidence does not disclose
that appellant ever had the stolen property in his pos-
session or was ever seen in or about the place where
the property was stolen at the time of the theft. There-
fore the evidence was not sufficient to sustain a verdict
of guilty and was contrary to law." The following is a
summary of the more material evidence introduced by
the State: The defendant had threshed wheat in the
Schmidt-Reibold neighborhood during three seasons, the
last season being 1920, but in July, 1925, he lived on
State Street in Evansville, Indiana, about 20 miles from
this neighborhood. On July 1, about 4 to 5 p. m., the
defendant was in the neighborhood in which chickens
were stolen on the night of July 3 from John Schmidt,
and on the night of July 7 from John Schmidt, Richard
Corder and Jacob Reibold. The automobile which the
defendant was driving late in the afternoon of July 1
was seen parked in the neighborhood at about 10 o'clock
that night, although defendant had inquired from a wit-
ness the way to Evansville that afternoon and had de-
parted in the direction of Evansville. The automobile
was a Ford touring car, "something like a '23 or '24
touring car," had "red hub caps and a top put on by
some mail-order house"; it had two glasses in the back

and diamond cord tires, "not the real diamond cord tires and were manufactured by some mail-order house." On the night of July 3 some person or persons stole 50 chickens from the chicken house of John Schmidt, and this is the crime with which the defendant is charged. The following morning, the footprints of two men were discovered leading from the chicken house across a corn-field to a road where an automobile had been parked. Feathers were found "all along until where they loaded up." Different witnesses testified that they examined the footprints; that they were made by a "larger and smaller man"; that the imprint of the left shoe of the smaller man had a noticeably peculiar mark, which was described substantially the same by witnesses. Witnesses also described the imprint of the two rear tires of the automobile as follows: "They looked like a dia-mond cord, but it was no Goodyear diamond tire; kind of a rectangular cut; the rear wheels had diamond cord print on them, but it wasn't no diamond cord; a kind of rectangular square, and it had a kind of seam right through the middle."

On the night of July 7, chickens again were stolen from Schmidt and also from Jacob Reibold and Richard Corder. Again, footprints of two men were found lead-ing over plowed ground from the chicken houses of Schmidt and Reibold to a point where an automobile had been parked. The descriptions by witnesses of these footprints and of the imprint of the rear tires of the automobile were identical with those of the foot-prints and tire imprints examined on the morning of July 4. About dark on Friday evening, July 10, the defendant was recognized by two witnesses while driv-ing a Ford touring car near the Schmidt-Reibold neigh-borhood. With the defendant was a "heavy set fellow; a heavier set man" than the defendant. Shortly after-wards, these same witnesses saw the Ford car parked

near a barn on the "Gascho place." One of the witnesses drove to Somerville and brought back the town marshal who stationed himself near the "Gascho barn" to watch the Ford. About 45 minutes later, two men (of whom one was identified by the marshal as the defendant) came up within three or four feet of the marshal, without observing him. When he spoke to them, they ran and he fired two shots from his pistol. One of them dropped "a bunch of sacks," in which were found chicken feathers. The marshal took possession of the Ford car and kept it until it was claimed by the appellant, who asserted that it had been stolen in Evansville on the night of July 10. This car was positively identified as the car which was being driven by the defendant when first seen in the neighborhood on July 1, and the imprint made by the rear tires of this car was identical with that made by the car (or cars) which was (or were) parked in the neighborhood on the nights of July 3 and 7, and to which the footprints led from the chicken houses of Schmidt and Reibold.

On the night of July 10, about 9 o'clock, Raymond Loehr, who lived near the Schmidt-Reibold farms, received information that "a chicken thief was in the community." He armed himself with his shot-gun and from a point near his chicken house watched for him. Some time afterwards, a man approached and when the witness "hollered" at him to "Halt," he turned and ran. The witness shot twice at him and was positive that he hit him. The witness also testified that he heard another man running; that he heard "two men running in the stubble"; that he "could tell what direction they were running, and where they came together. About forty-five minutes to an hour" later, witness saw two flashes and heard two shots "from right in front of the barn on the road," meaning the Gascho barn. The witness then went to the Gascho barn where he met the

marshal and several other men. Some one called police headquarters at Evansville and, as a result, two policemen went to the defendant's home in Evansville about 11:30 that same night and failed to find him at home. The policemen returned the following evening, Saturday, July 11, about 7 o'clock and again failed to find the defendant. They made a third trip "around midnight of the 11th of July," and found the defendant, and he accompanied them to police headquarters. He was detained until the following day, Sunday, July 12, when he was turned over to the sheriff of Gibson County.

In the meantime, on Saturday, July 11, about 10 or 11 o'clock a. m., the defendant went to police headquarters in Evansville and reported that his automobile, a Ford touring car, had been stolen in Evansville between 5 and 7 o'clock on the evening of July 10.

About 1:30 or 2 o'clock in the morning of July 11, a telephone call was received at the office of a taxi cab company in Evansville requesting that a cab be sent to a point two miles west of Buckskin to get a man who said his name was "Greek." The driver of the cab, accompanied by another man, drove to the place designated and met "Greek," who said he had wrecked his car in Buckskin and had left his family in Buckskin and that he would return in the morning to get them. "Greek" was limping and said that he had sprained his ankle. He first directed the driver to take him to Park Street and then said to drive to Sixth Street. He was taken to 500 Upper Sixth Street, where the driver "helped him into the back yard." A man at this address named Sam Mosquowitz, who was in the poultry business, paid the fare to the driver. As respects the identity of "Greek," the driver and his companion testified as follows:

"This (the defendant) looks like him."

"He looks like the man that got into the car."

"It looks like this fellow here."

"Well, it favors him" (i. e. the defendant).

"I think it is" (i. e. the defendant was "Greek").

On Sunday, July 12, the defendant was brought to Somerville, Gibson County, in the custody of the sheriff. His body was examined by a Dr. Wood, who found two or three shot in his back and "eight shot between the calf of his leg and his waist." The defendant claimed that he had been shot while hunting several months previously. The doctor testified that the shot wounds had been made within a few days prior to the examination. The shoes of the defendant fit the tracks. left by the person at whom Loehr shot on the night of July 10; and the impression made with the left shoe of the defendant was described by witnesses as being identical with the imprint of the left shoe of the same person. Further, the description of the footprints left by the two men who were frightened away by the shots fired by Loehr on the night of July 10 tallied exactly with that of the footprints which were discovered and examined on the mornings of July 4 and 8. As already stated above, the automobile which was seized at the Gascho barn belonged to and was claimed by the defendant, and the description of the imprint of its rear tires was identical with the description of that of the rear tires of the automobile (or automobiles) which was (or were) parked near the scene of the chicken stealings on the nights of July 3 and 7.

We have not set out in detail the whole testimony, and have omitted many corroborating circumstances. But we think that the jury was not merely justified in concluding, but forced to conclude, that the defendant and another person came to the Gascho barn in defendant's Ford touring car on the evening of July 10; that they left the car there and went to the Loehr place to steal chickens, and that Ray-

mond Loehr shot at and hit the defendant. There was no reasonable doubt, on the evidence, that the defendant was the mysterious "Greek" who called the Evansville taxi company early in the morning of July 11, and was delivered at the house of a poultry dealer who paid the taxi fare for the defendant. The foregoing conclusions necessarily involved the belief by the jury that the testimony offered by the defendant respecting his movements on the night of July 10 was perjured; this, of course, influenced the jury's evaluation of other testimony, especially the testimony offered to prove an alibi for the night of July 3.

The foregoing facts furnished the information by which the jury was justified in concluding that the defendant's automobile was the one used by the persons who stole the chickens on the nights of July 3 and 7, and that the defendant was one of those persons. The circumstances constituted a case of establishing identity through evidence from traces or mark. 1 Wigmore, Evidence, §149. As pointed out by Wigmore, the use of evidence from traces combines two inferences, "i. e. from the finding of the trace or mark it is inferred that some person bearing that trace or mark was present at the time and place of doing the act charged, and from the peculiarities of the trace or mark it is inferred that the accused was identical with that person." 1 Wigmore, Evidence, §414.

"The evidencing feature (i. e. the mark) is usually a group of circumstances, which as a whole constitute a feature capable of being associated with a single object. . . . It is by adding circumstance to circumstance that we obtain a composite feature or mark which as a whole cannot be supposed to be associated with more than a single object." 1 Wigmore, Evidence, §411.

If the defendant's relation to the events of the night of July 10, and his ownership of the Ford touring car

had not been discovered, we think that the footprints and the pattern of the tires should have convinced any reasonable person that the persons who stole chickens on the nights of July 3 and 7 were attempting to steal chickens from the Loehr place on the night of July 10. The net result of the events of the night of July 10 was to fasten upon the defendant the "composite feature or mark" which identified him as one of the two persons who "was present at the time and place" of the chicken theft on the night of July 3—the offense for which he was being tried.

We think that the evidence was sufficient to justify the jury's concluding that the defendant was a party to a plan or scheme to commit a series of thefts, of which series the offense in question was one. When evidence of other acts is relied upon to establish the existence of a plan or scheme from which the jury is to infer that the defendant committed the act in question, a high degree of probative force is required. When "the object . . . is not merely to negative an innocent intent at the time of the act charged, but to prove a pre-existing design, system, plan, or scheme, directed . . . to the doing of that act," i. e. "to establish a definite prior design or system which included the doing of the act charged as a part of its consummation . . . there must be, not merely a similarity in the results, but *such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.*" 1 Wigmore, Evidence, §304. We think that the foregoing test was satisfied by the evidence presented in the trial of this case, and that the evidence was easily sufficient to support the verdict of the jury.

Appellant makes the point that "circumstantial evidence, to sustain a conviction must exclude every reasonable hypothesis of the innocence of the accused." That

is a correct statement of a rule for the guidance of the trial court, and is simply another form of the rule that the jury must be convinced beyond a reasonable doubt of the guilt of a defendant. For if, after considering all the evidence, a juror's mind entertains reasonably a hypothesis of innocence, it cannot be said that his mind is convinced of the guilt of the defendant beyond a reasonable doubt. In *Wrassman* v. *State* (1921), 191 Ind. 399, 132 N. E. 673, the appellant contended that a court of review, in passing on the sufficiency of the evidence to sustain a verdict based upon circumstantial evidence, should enforce the requirement that the circumstances must "rise to such a degree of cogency and force as, in the order of natural causes and effects, to exclude, to a moral certainty, every other hypothesis except the single one of guilt." The appellant relied upon *Cavender* v. *State* (1890), 126 Ind. 47, 25 N. E. 875; *Robinson* v. *State* (1919), 188 Ind. 467, 124 N. E. 489; and *Hamilton* v. *State* (1895), 142 Ind. 276, 41 N. E. 588. In *Wrassman* v. *State, supra,* Townsend, C. J., speaking for this court, effectively disposed of that contention in the following statements: "If the language used by Judge Mitchell in the Cavender case was intended to convey the impression that where there are two *reasonable* hypotheses arising from circumstantial evidence, one of which is innocence and the other guilt, that it is the duty of a court of review to draw the inference of innocence, then this language must be disapproved. If it is meant to be a pronouncement of the law which should govern juries and trial courts, then it is approved."

We think appellant is in error in claiming that the language of the Cavender case was approved in *Robinson* v. *State, supra,* in the sense that he claims. The question before the court was error in refusing to give an instruction which embodied this principle of law. It

certainly was not meant nor intended by the Robinson case to convey the impression that the rule quoted from the Cavender case is one which governs a court of review, in passing on the sufficiency of evidence, in the same *sense* and in the same *manner* that it governs the trial court and jury."

In further support of his proposition that the evidence was not sufficient to sustain a verdict of guilty, the appellant makes the following points: "2. Conviction can be sustained only upon the theory that the facts proven were sufficient to authorize an inference that appellant made tracks in the cornfield on July 10th, and that these were similar to tracks made at the time of the thefts on July 3rd and July 7th, but an inference cannot be based upon an inference.

"3. If it be contended that the evidence was sufficient to establish the fact that appellant was in this neighborhood on the night of July 10th, this cannot sustain a conviction except upon the theory that he was there for the purpose of stealing chickens, and therefore that he stole the chickens on July 3rd and on July 7th, and an inference cannot be based upon an inference."

The obvious fallacy in point 2 is in assuming that the jury *inferred* that the tracks were made in the cornfield on July 10 by defendant, and inferred that they "were similar to tracks made at the time of the thefts on July 3rd and July 7th." We may say that the jury inferred that the defendant was the man at whom Loehr shot (and the man whom he hit) on the night of July 10. But the direct testimony of Loehr established that the man at whom he shot ran through the cornfield at the place where the tracks were found. Also direct testimony established the correspondence between the tracks made by the defendant on the night of July 10 and those made at the time and place of the thefts on the

nights of July 3 and 7. It was a matter of credibility and not of inference. If the contention of the defendant were sound, courts would be compelled to reject all conclusions based upon fingerprint evidence.

If, as suggested by point 3, the evidence merely established that defendant was in the neighborhood on the night of July 10, and that chickens were stolen on the nights of July 3 and 7, the jury could not have inferred that he was there for the purpose of stealing chickens on the night of July 10, and then inferred from that inference that he stole chickens on the night of July 3 and 7. Proof of a fact is also proof of all reasonable inferences therefrom, but not of unreasonable inferences; and it clearly would be unreasonable to infer that appellant stole chickens on the nights of July 3 and 7 simply because, on the night of July 10, he was in the neighborhood where these chickens were stolen on the nights of July 3 and 7.

We assume that the jury in reaching its verdict considered all the facts, whether established by direct testimony or by reasonable inference from facts established by direct testimony; and our concern is to determine whether the jury, on the evidence before it, reasonably could have reached the conclusion that the defendant stole the chickens on the night of July 3. By arbitrarily breaking up the evidence into separate bits, and by insisting that the mental processes of the jurors, as applied to these bits of evidence, must meet an excessively refined analytical test, we might conclude that there are theoretical gaps in the evidence. It is necessary, however, that we leave to the sound judgment of the jury some margin for logical grouping of facts for the purpose of drawing inferences of fact, and for the utilization of these inferences of fact with other facts as the basis of further inferences of fact. After all, the "logic" or "reason" which we should expect of

the jury is largely a common-sense evaluation of the probative force of all the evidence in the light of every day experience and observation.

The analogy of the links of a chain as a test of circumstantial evidence is often misleading, since the circumstances necessary to establish the guilt of a defendant are not a fixed number of facts corresponding to links in a chain.

"It is quite true, as contended by counsel for the defendant, that a chain can not be stronger than its weakest link, and hence, where the fact of guilt depends upon proof of a series of links constituting a chain, the absence of a single link will be as fatal to a conviction as the absence of all the links. *But the simile of a chain and links can only be applicable where there is a series of facts, one succeeding another, and each connected with and dependent upon the other.*" (Our italics.) *Bressler* v. *People* (1886), 117 Ill. 422, 438, 8 N. E. 62.

"Circumstantial evidence, strictly speaking, consists of a number of disconnected and independent facts, which converge towards the fact in issue as a common center. These concurrent and coincident facts are arranged in combination by a mental process of reasoning and inference, enlightened by common observation, experience, and knowledge. *Where presumptions arise from a number of connected and dependent facts, every fact essential to the series must be proved.* Such evidence is like a chain, in which no link must be missing or broken which destroys its continuity. Circumstantial evidence is, like a wire cable, composed of many small associated but independent wires. Wire cables are often used to sustain ponderous bridges over rivers. The strength of the cable depends upon the number of wires which are combined, but some of the wires may be broken, and yet the cable be sufficiently strong to uphold the structure. As no chain is stronger than its weak-

est link a chain is less reliable when it has a great number of links, but a wire cable is strengthened by an increase in the number of its wires. This combination of attenuated wires may be stronger than a solid rod of iron of the same size which may have flaws affecting its strength. When circumstantial evidence consists of a number of independent circumstances, coming from several witnesses and different sources, each of which is consistent, and tends to the same conclusion, the probability of the truth of the fact in issue is increased in proportion to the number of such circumstances." (Our italics.) *United States* v. *Searcey* (1885), 26 Fed. 435, 437. In each case there are a few essential and ultimate facts which must be established in order to sustain a verdict of guilty, but there may be hundreds of circumstances from which these ultimate facts may be inferred. When we speak of an essential link being absent in a case of circumstantial evidence, we can mean only that there is no evidence of any fact or facts from which to infer the facts essential to support the verdict.

Appellant's fourth proposition is that the trial court committed reversible error in overruling appellant's motion to withdraw submission and discharge the jury. This motion was predicated upon improper remarks by the special prosecutor, the substance of the remarks being that, in case of acquittal, the attorneys for defendant would institute civil suits against parties responsible for the prosecution. The trial court sufficiently admonished the jury to disregard the statements. It is not conceivable that the remarks could have made such a prejudicial impression upon the minds of the jurors that it persisted after the careful admonition by the court. Further, as stated by the trial court, the attorneys for the defendant had stated to the jury that the special prosecutor was in the case for the fee which he was securing from certain farmers living in the

neighborhood from which the chickens were stolen. We must assume that the members of the jury were intelligent enough to see that the exchange of remarks by counsel had nothing to do with the merits of the case.

Appellant insists that the evidence in the case was wholly circumstantial and, consequently, the giving of instruction No. 14 was error because this instruction informed the jury that the State sought a conviction "largely on circumstantial evidence." The *corpus delicti* was proved by direct evidence, and the instruction was not inaccurate in the light of the whole evidence. Further, instruction No. 14 was immediately followed by one which stated that the State sought a conviction "on circumstantial evidence," and instruction No. 14 is almost identical with defendant's tendered instruction No. 4.

Appellant also urges that the giving of instruction No. 17 was error. Instruction No. 17 directed the jury as to the proper use of evidence of other offenses. The court correctly limited the effect to be given the evidence of these other offenses. The instruction referred to certain footprints being found "in the fields at the homes of one John H. Schmidt and one Jacob Reibold and near the residence of one Joseph Loehr," while the evidence was that these particular footprints were in the field of one Weisheit. The instruction referred to evidence as to the impressions the shoe which the defendant, Gears, was wearing on July 12, 1925, made "in the footprints," etc., and the significant thing was the fitting of the shoe into the footprints and not the location of the footprints. The inaccuracy was merely verbal and could not have made any prejudicial impression on the jury.

The court did not err in refusing to give tendered instruction No. 8. The court's instruction No. 18 fully and adequately covered the defense of alibi. In *White*

400

v. *State* (1869), 31 Ind. 262, cited by appellant, the trial court instructed, in effect, that the defense of alibi required the defendant to "account for his whereabouts during all the time the offense was probably committed, and his failure to do so would be a circumstance against him." In the instant case, the trial court carefully stated to the jury that "the State must prove the presence of the defendant beyond a reasonable doubt, and the attempt of the defendant to prove an alibi does not shift the burden of proof from the State"; and that "it will be sufficient if the evidence raises a reasonable doubt of his presence at the time and the place when the crime charged in the affidavit is alleged to have been committed."

We conclude that the trial court did not err in overruling appellant's motion for a new trial.

Judgment is affirmed.