## 27416. LUNSFORD *v.* THE STATE.

538

Decided July 15, 1939. Rehearing denied July 29, 1939.

*Carl B. Copeland, Durwood T. Pye,* for plaintiff in error.

*John S. McClelland, solicitor, John A. Boykin, solicitor-general, J. W. LeCraw,* contra.

MacIntyre, J. At the September term, 1937, of the criminal court of Fulton County, Joel Lunsford was tried and convicted under an accusation charging that on January 28, 1937, he did keep, maintain, and operate a lottery known as the "number game," for the hazarding of money. His certiorari was overruled, and he excepted.

■ Before the hearing of the certiorari, and in accordance with the provisions of the Code, § 19-302, the defendant, filed certain exceptions to the answer of the trial judge, on the ground that the answer did not reply specifically to all the allegations of the petition, as provided in the Code, § 19-301. Paragraph 1 of the judge's answer was as follows: "The allegations of paragraphs 1, 2, 3, 4, and 5, respondent states that he admits, with the following qualification and addition: Upon the trial of said case all of the evidence and proceedings were taken down stenographically by a competent court reporter, which record has now been transcribed, and respondent attaches hereto a copy of said transcription as setting out a true and correct statement of all the evidence that was adduced upon the trial of the case, including the statements of the contentions by the solicitor representing the State, objections made

by counsel, and rulings of the court, all of which is attached hereto marked Exhibit Y." A similar answer was made to other paragraphs of the petition. On the exceptions to the answer, the judge of the superior court ruled, in part, as follows: "The court is of the opinion that the trial judge may adopt in whole or in part the recitals of the petition for certiorari; he is not required to do so. The court is further of the opinion that the trial judge is not required to answer categorically and [the?] various statements set out in the petition for certiorari, but that it will suffice if he sets forth in detail the entire proceedings in the case. That was done in this case in the 71 pages which comprise the stenographic report of the case, including the evidence introduced and the rulings of the court."

While the Code, § 19-301, declares that the answer of the trial judge to the writ of certiorari "shall reply specifically to the allegations in the petition," since the purpose of said requirement is to enable the judge of the superior court to understand and determine whether the errors complained of in the petition were committed, and since in the present case the trial judge actually attached to his answer a stenographic report of the evidence, including the statement of the contentions by the solicitor representing the State, objections made by counsel, and rulings made by the court, which report is stated by the trial judge in his answer to be a true and correct report of these matters, as to the paragraphs containing allegations in reference to such matters, the answer was a substantial compliance with the Code. The practice here adopted by the trial judge seems to have been heretofore approved by this court. *Ealey* v. *State,* 57 *Ga. App.* 184 (194 S. E. 881). See *Norris* v. *Sibert,* 53 *Ga. App.* 440 (186 S. E. 199). In *Southern Ry. Co.* v. *Leggett,* 117 *Ga.* 31 (43 S. E. 421), the justice certified merely "that true copies of all the proceedings in said cause are herewith sent up," and in reference to the brief of evidence he certified that "the foregoing brief of testimony is true in substance and in form, as far as I can recollect." See also *Ford* v. *Toomer,* 116 *Ga.* 795 (43 S. E. 45) ; *Stephens* v. *Barns,* 11 *Ga. App.* 491 (75 S. E. 827). As to paragraphs 2 and 3 of said petition, to the effect that the defendant filed a plea of autrefois convict to the accusation, and that the same was dismissed on oral motion based on the ground that said plea was insufficient in law, the answer was obviously de-

fective. The stenographic report of the proceedings attached to the answer showed nothing as to this matter. It is not clear from the answer whether the trial judge meant to certify that the stenographic report contained all of the proceedings in said case, and by his answer to say that if anything appeared in the allegations of the petition for certiorari which did not appear in the stenographic report, it was denied. Accordingly, while the exceptions should have been sustained as to the answer to these paragraphs, since thereafter the defendant filed a traverse of the answer made to these paragraphs in so far as it tended to discredit the allegations made, and since the judge of the superior court sustained the traverse and found that "the facts as to these matters are as set out in paragraphs 2 and 3 of plaintiff's petition," and thereafter so considered the certiorari, the defect in the answer was cured, and no harm resulted to defendant from the overruling of this exception. Thus, while we are of the opinion that the answer, except as pointed out above, was a substantial compliance with the Code provision, we do not think it amiss to say that we think the better practice in such cases would be, where the trial judge does not care to categorically admit or deny the allegations of the various paragraphs of the petition for certiorari, but desires to stand on the stenographic report of the proceedings as the truth of the matters alleged, that as a general rule, in answer to each paragraph containing allegations as to evidence, objections of counsel, and rulings of the court, he quote the pertinent part of the report in reference to the allegations made in each paragraph, instead of merely admitting the allegations except in so far as they may conflict with the stenographic report attached, as in the present case.

To the indictment the defendant filed a plea of autrefois convict, alleging that on April 12, 1937, he had pleaded guilty to an accusation in the city court of Jonesboro, Clayton County, which charged him with operating and conducting a lottery in Clayton County "by selling tickets to purchasers who [if they?] guessed a certain number would receive five hundred times the amount of the purchase-price of said ticket;" "that the offense of keeping and maintaining a lottery known as the number game in Clayton County, Georgia, for which offense this defendant is accused in the accusation in this court, is the same offense; they

are both a part of the same transaction, and is the same offense; the same evidence, or parts of the same evidence, will be used against this defendant." The trial judge struck this plea, on motion, as insufficient in law. Exceptions to this ruling were taken. We are of the opinion that this judgment was correct. The specific charge made against the defendant in the accusation was keeping, maintaining, and operating a scheme or device for the hazarding of money, known as the number game. We have heretofore had occasion to deal with this lottery and describe its method of operation. See *Cutcliff* v. *State,* 51 *Ga. App.* 40 (179 S. E. 568); *Turk* v. *State,* 55 *Ga. App.* 732 (191 S. E. 283), and cit. Omitting the details, in the operation of this lottery members of the general public are solicited to select a number of three digits which is written on a ticket. Two copies are made, the original is given to the person selecting the number, one of the copies is retained by the writer, and the other copy is turned over to the headquarters of the lottery. On the number selected the purchaser wagers as much money as he desires, receiving back 500 times the amount wagered if the number selected is the winning number. The money collected by those writing the tickets is also turned into the lottery headquarters. The winning number is determined by the hundred thousand, the ten thousand, and the thousand digits of the total number of bond sales of the New York Stock Exchange for that particular day. The writers of the winning numbers pay them off. It does not appear that payment is made at any particular place, but wherever the winner may be found. The contention of the defendant was, that he had operated a lottery of the above character, and its operation had been carried on in both Fulton and Clayton Counties; that tickets had been sold and wagers made and paid to persons in both counties on the same day and in the operation of the same lottery; that he had been convicted of maintaining, keeping, and operating this lottery in Clayton County, and therefore, in view of the provisions of the constitution that "No person shall be put in jeopardy of life, or liberty, more than once for the same offense, save on his, or her own motion for a new trial after conviction, or in case of mistrial" (Code, § 2-108), he could not be again convicted of the operation of this lottery in Fulton County. The question here raised is no less difficult than it is interesting. The above provision of the

constitution embodies a very substantial and important right, and courts should be jealous to guard against its infraction.

The offense charged against the defendant is that found in Code, § 26-6502, as follows: "Any person who, by himself or another, shall keep, maintain, employ, or carry on any lottery or other scheme or device for the hazarding of any money or valuable thing, shall be guilty of a misdemeanor." It is argued by the defendant with much force that the words "keep, maintain, employ, or carry on," as used in this section, necessarily imply duration, permanence, and continuity; that the law does not take notice of a fraction of a day, so as to permit the segregation of the various acts committed in the operation of such lottery into more than one offense of operating, maintaining, or carrying on a lottery, whether committed in the same county or in different counties of this State; that all violations of law are against the sovereign State, and not against the several counties therein; and that where the State, through one of its counties, has exacted the penalty against the defendant for such a transaction, it can not, through another agency, again exact the same penalty for the same transaction, merely because the transaction covered more than one county. Whether or not one general transaction, carried on on the same day with the same motive and having the same impulse, may be considered as constituting more than one crime of the same character, must be determined by the character of the crime charged and a multiplicity of other circumstances; and no general rule applicable to all cases can be laid down. It is unquestionably true that if the defendant operated only one lottery within the purview of the statutes of this State, under the constitutional provision above quoted he could not be convicted more than once therefor. Various circumstances serve to individualize a crime. After mature deliberation we have come to the conclusion that in the operation of a lottery of the kind and character here charged, where those operations extend into two counties, since the acts done in each of the two counties, within themselves and without any reference to acts done in the other county, constitute every element of the crime of keeping, maintaining, and operating a lottery or other scheme or device for the hazarding of money, in so far as the State is concerned two distinct crimes of the above character have been committed against it. In neither of the counties, in such a lottery,

did the defendant maintain a central point where a drawing was made to determine the winning number. The winning number was in fact determined in the State of New York where the total bond sales of the New York Stock Exchange were tabulated. An entire lottery was carried on in each county.

The defendant had pleaded guilty to an accusation in Clayton County, charging him with conducting and operating a lottery in that county "by selling tickets to purchasers who [if they?] guessed a certain number would receive five hundred times the purchase-price of said ticket." It is therefore conclusively established by his own solemn admission that he did so operate and conduct such a lottery in Clayton County, in the manner alleged. In our opinion, if in fact he did commit similar acts on the same date in Fulton County, that is, if he committed in Fulton County acts which standing alone would constitute the complete offense of the operation and maintenance of a lottery (and it is to be remembered in this connection that if he committed no such crime in Fulton County, this constitutes a good defense to the charge made against him in the accusation), then the previous conviction in Clayton County could not be pleaded in bar to such accusation, for the reason that, though the acts may have been committed on the same day as a part of the same general transaction and with the same motive and intent to violate the law, the acts themselves constituted separate offenses of operating, maintaining, and keeping a lottery, as to which the courts of both Fulton and Clayton Counties could convict him. In other words, where the defendant engages in the operation of a lottery such as the "number game," wherein through agents numerous purchasers are sold tickets with numbers thereon of their own choosing, and on which they wager any amount of money they desire, with the possibility of obtaining back 500 times the amount thus wagered, and such operation of the lottery covers several counties in this State, he is guilty of operating and maintaining a lottery in each of these counties, for the reason that he has committed a series of acts which, though they be part of the same general transaction, constitute in themselves every element of the offense of operating, maintaining, and keeping a lottery; and since our constitution declares that "all criminal cases shall be tried in the county where the crime was committed" (Code, § 2-4306), each county in which such crime is

committed would have jurisdiction to try him without reference to whether he did, on the same day and in the same general transaction, commit other separate though similar acts and crimes in another county. It is true that in one sense of the word the whole of the daily operation of the lottery constitutes one transaction; yet, on the other hand, the series of acts committed in so conducting the lottery in each county themselves constitute separate and complete offenses for which each county may convict.

To entitle the accused successfully to plead former acquittal or conviction, the offenses charged in the two prosecutions must be the same in law and in fact. *Holl* v. *State,* 38 *Ga.* 187; *Jones* v. *State,* 55 *Ga.* 625; *Buhler* v. *State,* 64 *Ga.* 504; *Goode* v. *State,* 70 *Ga.* 752; *Knight* v. *State,* 73 *Ga.* 804; *Knox* v. *State,* 89 *Ga.* 259 (15 S. E. 308). It is apparent from what we have said that the offenses committed in Fulton and Clayton Counties could not be the same in law and in fact. Whether or not the principle of the decision in State of Ohio *v.* Shimman, 122 Ohio St. 522 (172 N. E. 367), cited by counsel for the defendant, to the effect that "a continuous and uninterrupted transportation of intoxicating liquor, whether within one county or in more than one county, constitutes a single offense, punishable in either county, but not in both; and a conviction therefor in one county may be pleaded in bar to a prosecution in the other," and other cases of similar import (73 A. L. R. 1502 and note), would be adopted as the rule in this State in a proper case, need not now be determined, since the facts here presented are in our opinion materially different. It will be noted that in the above case there were not a series of distinct and separate acts, but merely one continuous, uninterrupted act which extended into more than one county. It is to be further noted that in that case a very vigorous dissent from the majority ruling was filed, in which dissent three of the judges concurred. Moreover, the rule is that all crimes must be tried in the counties wherein they are committed. Generally the rule is, as at common law, that a plea of former conviction or acquittal in one county can be pleaded only in the same county; the reason assigned being that all indictments are local, and if the first indictment is laid in the wrong county the defendant can not be found guilty on it and could not have been in legal jeopardy. To this rule there are a few exceptions, as in larceny where the defendant may be tried in

the county into which the stolen property is carried, or in the county where it may be found, as well as in the county where the property was stolen; and also in cases of changes of venue. Thus it should appear from the plea of former conviction or acquittal in another county how the court of the former trial obtained jurisdiction. In other words, if the plea here had alleged that the defendant had been acquitted or convicted in the same county where the case was pending, the usual form of a plea of autrefois convict or acquit would have withstood the oral motion to dismiss; but where the plea showed that the former accusation was in a different county, it should have stated how that court obtained jurisdiction (to illustrate), by specifically setting up that the venue had been legally changed, or that it was a case of larceny, and that the offender had carried the stolen property into the county of the former trial, or, if we concede the principle of the decision in the Shimman case, supra, that it was one continuous, uninterrupted, single offense committed in both counties, etc. In other words, if the defendant had wished to bring himself within the exceptions to the general rule, he should have specifically pleaded the exceptions. Campbell v. People, 109 Ill. 565, 571, 575 (50 Am. R. 621); People v. McDaniel, 137 Cal. 192 (69 Pac. 1006, 92 Am. St. R. 81, 99).

On the trial S. D. Vaughn, a police officer, was permitted to testify as to the manner of the operation of the lottery set out in the accusation. This lottery is commonly referred to as the "number game" or the "bug game." Its method of operation as described by Vaughn was the same as has been many times heretofore described by this court in other cases as deduced from the evidence in those cases. For complete details in this connection reference may be had to the cases cited in the second division of this opinion. His testimony was objected to on the ground that it appeared on cross-examination that he had never played the game, and that his knowledge of the manner of its operation was gained through information from others. In *Andrews* v. *State,* 56 *Ga. App.* 12 (192 S. E. 73), it was ruled: "The testimony as to the manner in which the 'number game' (lottery) was operated was properly admitted, although the witnesses may have stated that they had no actual experience but had obtained their information from others." To the same effect are *Sable* v. *State,* 48 *Ga. App.* 174 (172 S. E. 236); *Crawford* v. *State,* 49 *Ga. App.* 801 (176 S. E.

92); *Brown* v. *State,* 57 *Ga. App.* 838 (197 S. E. 77). Counsel for the defendant does not cite or discuss any of these cases, and makes no request to overrule them. It appears that the witness's assignment as a police officer was to track down and prosecute offenders against the lottery laws; and that while at the inception of his investigations concerning lottery operations much of his information as to them and their operation was, from necessity, gained from others, it is clear that from experience and observation of corroborating facts and circumstances within the witness's own knowledge he actually knew of his own knowledge of the method of the operation of the lottery as testified to by him. The objections to the testimony of this witness were therefore clearly without merit. Moreover, it appears that the State introduced other witnesses who had worked in organizations operating this type of lottery, and who gave the jury first-hand information as to the methods of its operation. See *Lovett* v. *State,* 60 *Ga.* 257; *Usher* v. *State,* 27 *Ga. App.* 776 (110 S. E. 414); *Glisson* v. *State,* 57 *Ga. App.* 169 (194 S. E. 877).

■ The State introduced evidence to the effect that on September 29, the day after the crime was alleged in the accusation to have been committed, the defendant and others were apprehended, in a house in Clayton County, with lottery tickets and other lottery paraphernalia. Counsel for the defendant objected to the introduction of this testimony, on the ground that it was irrelevant and immaterial, for the reason that it was "a transaction separate and distinct from that for which defendant was on trial, and a transaction taking place in Clayton County, and one taking place after the date of the charge alleged in the accusation." It does not follow, as stated in the brief of counsel for the defendant, from the fact that the plea of autrefois convict was without merit, as we have ruled, that this evidence should be held to have been inadmissible. Under numerous rulings of this court the evidence was properly admitted. The defendant's possession of lottery tickets and other lottery paraphernalia at a house in Clayton County in close proximity to Fulton County on the day after the date of the operation of the lottery charged, together with the evidence indicating that the house had been used for sometime previous thereto as the headquarters of the defendant in the operation of his lottery, together with the other evidence, tended to sustain the charge

made, and more especially to throw light on certain documents found in a house in the City of Atlanta, occupied by the defendant, which a police officer testified in his opinion were records kept in the operation of such a lottery. See *Crawford* v. *State,* supra; *Guthas* v. *State,* 54 *Ga. App.* 217 (187 S. E. 847). The facts were closely connected in point of time and locality, and tended to show a systematic scheme on the part of the defendant to violate the lottery laws.

■ A witness for the State was permitted to testify that a house in which the officers found certain lottery tickets and other papers was the defendant's home. The testimony was objected to on the ground that it appeared on cross-examination that the testimony was hearsay. While this witness did testify that he knew it was the defendant's home because the defendant's wife told him so, he further testified as follows: "Q. Do you know that was Mr. Lunsford's house? A. Sure, he lives there. Q. Have you ever seen him there? A. Yes, I have seen him drive in there several times. Q. You have never been there though when Mr. Lunsford was there? A. It seems like I was there several times. Q. You have never been there though when Mr. Lunsford was there? A. It seems like I was there one time and talked to him one time, it seems like, there at his house. Q. You are just surmising that's his house he lives in? A. Well, his wife said—. Q. You can't tell that. A. Yes, I've seen him go there, and know he lives there. I can swear he lives there, because I have seen him go there and seen him at home there." In view of this testimony, the objection was properly overruled.

■ S. D. Vaughn, a police officer who had theretofore testified as to his familiarity with the operation of the lottery known as the "number game," was shown certain documents which the officers found in the defendant's residence in Fulton County on September 28, and was permitted to testify, in part, as follows: "Q. I will ask you to examine these records and, from your knowledge of the lottery you have already testified to, to state whether or not that is used in the operation of the lottery and what that record represents? A. This here to the left would indicate the writers' numbers or the names of the pick-up men. This right over in this line here is either the shortage or the over of each man. This is the amount of money that is supposed to have been turned in. Q.

What does that last line represent? A. The hits. Q. In other words, those sheets represent the headquarters record of a pick-up man? A. This here is the only headquarters sheet I have ever seen where they keep any headquarters sheets. My knowledge of this particular sheet is just from what I have looked at and figured out. . . Q. I will ask you to look at these other sheets found in this other bag, and say whether or not that is a daily record or a weekly record. A. This is a daily record. Q. I will ask you to compare these white slips found with those, and state whether or not they refer to the same record, and whether they are a daily record or a weekly record? A. This here indicates a weekly record of each man's turning in. Q. Of each man's turning in in connection with the operation of the lottery? A. Yes. Q. All these white sheets, look at them generally and say if they represent the same type of record as being weekly sheets of each man, these white ones. A. Yes, sir, that's what these white sheets indicate, the weekly record. Cross-examination: Q. You never made those records, did you? A. No. Q. You didn't see any other person make them? A. No. Q. You never worked in the headquarters of a lottery office in your life? A. No. Q. How many other sheets similar to that did you ever see? A. These are the first ones I have really ever looked over or examined. Q. Does that apply to both the white sheets and the yellow sheets there? A. Yes. Q. Then what you said about what they represented is just a conclusion you formed from looking over those papers? A. Yes; in other words, I got it from studying the papers. Q. In other words, after you looked over the papers you reached the conclusion that is what it is, and that is what you testified? A. Yes." The court overruled the defendant's objection that the testimony of the witness was a mere conclusion. This evidence was properly admitted. The witness had testified as to his familiarity with the operation of the lottery, and it is clear that after examining the paper he could give it as his opinion that they were records kept in the operation of such lottery. The weight to be given to his testimony in this connection was for the jury. See *Thomas* v. *State,* 67 *Ga.* 460 (4); *Howe Machine Co.* v. *Souder,* 58 *Ga.* 64; *Wilensky* v. *State,* 15 *Ga. App.* 360 (4) (83 S. E. 276).

■ A witness introduced by the State testified that he had worked for the defendant in the operation of the "number game," and this

testimony was objected to as a mere conclusion on his part. The objection was without merit. The witness gave the full facts upon which he based his statement that he had worked for the defendant, and the evidence tended, in a marked degree, to sustain the statement.

■ It appears that the solicitor, during the trial, announced that the State rested. Counsel for the defendant thereupon announced that the defendant also rested. The solicitor then said: "The defendant hasn't made any statement." It appears from the record that counsel for the defendant merely stated to the court, at the time this statement was made: "I don't think he ought to make a statement like that." In his answer to the certiorari the trial judge stated: "Counsel for the defendant did not insist upon the court making a ruling, and the court did not understand that the statement of counsel called for a ruling; and consequently no ruling was made." Counsel for the defendant having made no motion for mistrial, or objection, except to state to the court, "I don't think he ought to make a statement like that," and not having insisted upon a ruling by the trial court, the ground does not show reversible error. See Code, § 81-1009; *Patton* v. *State,* 117 *Ga.* 230 (43 S. E. 533); *Benton* v. *Hunter,* 119 *Ga.* 381 (46 S. E. 414); *Hendrix* v. *State,* 173 *Ga.* 419 (160 S. E. 614); *Simmons* v. *State,* 181 *Ga.* 761 (184 S. E. 291); *Sloan* v. *State,* 183 *Ga.* 108 (187 S. E. 670); *Brooks* v. *State,* 183 *Ga.* 466 (188 S. E. 711, 108 A. L. R. 752); *Benton* v. *State,* 185 *Ga.* 254 (194 S. E. 166). Even if it be conceded that objection was properly made, it can not be said, under the circumstances, that the ground shows reversible error. Compare *Head* v. *State,* 58 *Ga. App.* 375 (198 S. E. 550).

■ In his argument to the jury the solicitor stated: "We found him [the defendant] caught cold with the documentary evidence that Cal says he picked up in his possession in Clayton County, with his sister-in-law and this poor little innocent-looking girl that they dragged down there and paid $10 a week to flirt with the chain-gang. He walked around himself and hired these poor negroes and these white people to make chain-gang fodder out of them." Counsel for the defendant objected to this argument, on the ground that it was improper, and moved for a mistrial to be declared. The court overruled the motion. On inspection of the evidence introduced, the argument made was not so far afield from

proper and legitimate conclusions therefrom that it can be said that the court should have granted a mistrial.

Counsel for the defendant made objection to other statements made by the solicitor in his argument to the jury, and moved for a mistrial. Upon the objection being made the court asked counsel for the defendant what the statements of the solicitor were. Counsel made reply, and the court stated to the solicitor that the argument was improper, sustained the objection, and instructed the jury to disregard the argument. It does not appear from the record that counsel thereafter insisted on his motion to declare a mistrial. The argument made does not appear to have been so prejudicial as to warrant the grant of a new trial.

Many other assignments of error as to the admission of testimony are made, which we have not specially dealt with. We have examined these various assignments, and find that for various reasons they do not show reversible error. None of them presents any novel question, and we do not deem it necessary to deal with them at length. The evidence amply authorized the verdict; and no error of law appearing, the judge did not err in overruling the certiorari.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*