STATE OF HAWAII *v.* STANLEY K. YOSHIDA.

No. 4152.

APRIL 25, 1961.

TSUKIYAMA, C. J., CASSIDY, WIRTZ, LEWIS, JJ.,
AND CIRCUIT JUDGE MCKINLEY
ASSIGNED BY REASON OF VACANCY.

OPINION OF THE COURT BY LEWIS, J.

Defendant, after jury trial, was convicted of bribing participants in a basketball game in violation of R.L.H. 1955, § 265-7. On November 24, 1959, defendant obtained issuance of a writ of error to review the judgment and sentence entered August 28, 1959.

The indictment charged that defendant:

" * * * on the 5th day of February, 1958, did, unlawfully, wilfully, and feloniously, promise and offer to Francis ———, James ———, and Rodney ———,[1] all player-members of the 1957-1958 Saint Louis High School Basketball Team of the Interscholastic League of Honolulu, a thing of value, to-wit, a dinner, with intent to influence them to limit their team's margin of victory in the Saint Louis High School versus Maryknoll High School game, a basketball game in which the said player-members expected to take part, * * *."

Defendant's first point is that the court "erred in permitting Ronald Kakuda to be repeatedly questioned after the witness had indicated that he did not wish to testify, and in finding the witness in contempt a total of thirteen

---

1 Throughout this opinion, the St. Louis basketball players will be referred to by first names or initials. Surnames contained in the indictment have been omitted.

times in the presence of the jury." Kakuda, co-indictee, who was sentenced on a plea of guilty before defendant's trial, was called as a witness by the State, and after testifying that he was in Oahu Prison for burglary and bribery, invoked the Fifth Amendment. He was informed by the court that he had no privilege thereunder, but refused to answer almost all of the questions put to him, by reason of which he repeatedly was held in contempt.

Defendant's counsel on this appeal concedes that his trial counsel interposed no objection to the questioning of this witness. No motion was made with respect thereto. At the request of defendant, the jury was instructed that Kakuda's refusal to answer questions should be totally disregarded. No reversible error has been shown. *State* v. *Brooks,* 44 Haw. 82, 86, 352 P. 2d 611.

While argument also has been presented concerning the questions and answers which established that Kakuda was, at the time of the trial, in prison for bribery, no objection or motion was made, or error assigned or specified with respect thereto, and accordingly this matter is not before us for review. *State* v. *Foster,* 44 Haw. 403, 429, 354 P. 2d 960.

Defendant's second point is that: "Prejudicial error was committed in permitting prosecution witnesses to testify to the commission of other offenses by Appellant." This point is based on specification of error #1, which however does not meet the requirements of rule 3(b)(4) of the rules of this court, concerning the manner of presenting alleged errors as to the admission of evidence.

In the body of the brief there is quoted testimony of James ———, one of the basketball players named in the indictment, who testified at page 40 of the transcript that defendant said, during the season, that he was "making money on all games," and that after the last game of the season, the championship game against Puna-

hou, witness went to defendant's house to eat dinner and on that occasion defendant said "that he made money on that game." This testimony all concerned the year 1958, in which as shown by other evidence the basketball season began January 7 and ran to and including February 22. The objection to James' testimony was not that another crime was being shown but instead that there could be no proof of events subsequent to the offense charged, the occasion of which was the Maryknoll game of February 5, 1958. Specifically the objection made was "to anything that might have been said after the Maryknoll game."

This testimony of James' at page 40, and certain testimony of his at page 54 of the transcript reviewed below, constitute all that is furnished us in support of defendant's second point asserting error in permitting proof of other crimes.[2] The evidence is not set out in the specification of errors as required by the above-cited rule; defendant's second point thus is improperly presented. Moreover, the objection actually made was to proof of subsequent events and this objection was not well taken as now shown.

According to the evidence above stated, defendant said he was making money on all games, which evidence included games subsequent to the Maryknoll game and in fact the last game in the season. It was relevant for the State to show that defendant was betting on the games

---

2 Testimony of N., another St. Louis basketball player, that Kakuda, Yoshida not being present, had seen him after the Kamehameha game and had said "that they lost the game because I believe I made two points that, which weren't supposed to be made," also is set out in defendant's brief but concededly was stricken upon defendant's objection "to anything that was said," the court ruling that "what transpired between this witness and Ronnie not in the presence of the defendant is stricken and the jury ordered to disregard." We do not consider this testimony of N's, in view of the record.

for the purpose of establishing his motive for bribing players to limit the point margin in a particular game, thus strengthening the proof that defendant intended to influence the players as alleged. Defendant did not have the right to have the proof limited to betting on the Maryknoll game and prior games, which was contrary to the fact. It was proper for the prosecution to show that at the time of the Maryknoll game defendant's plan was to bet on every game in the season, which would explain the elaborate lengths to which defendant went, as shown by other evidence reviewed below, and lend credibility to that evidence. See *Territory* v. *Abellana,* 38 Haw. 532 (evidence of holdup one hour later, part of "a preconceived evening's undertaking of lawlessness with the weapon" admissible) ; *Laird* v. *State,* 156 Tex. Crim. 345, 242 S.W. 2d 374 (two subsequent acts of barratry admitted to show systematic action in contacting injured railway employees) ; *Lunsford* v. *State,* 60 Ga. App. 537, 4 S.E. 2d 112 (prosecution for operating a lottery, possession by defendant at house where lottery was operated of lottery tickets and paraphernalia, one day after alleged crime, admissible).

The objections made at the trial did not urge either inadmissibility of evidence of other offenses or insufficiency of proof thereof, which matters now are argued as defendant's second point. Furthermore, such contentions are not valid.

It is a mistaken notion that relevant proof is to be excluded merely because it also shows the commission of another offense. *Territory* v. *Caminos,* 38 Haw. 628; *Territory* v. *Awana,* 28 Haw. 546; *Territory* v. *Chong Pang Yet,* 27 Haw. 693; *Territory* v. *Hamilton,* 39 Haw. 14; *Territory* v. *Alford,* 39 Haw. 460; *State* v. *Carvelo,* 45 Haw. 16. Motive and intent may be shown even though other offenses are disclosed by the evidence. Cases cited by

defendant are distinguishable on the facts or by reason of Hawaiian precedents.

That defendant was betting on all the games of the season was a relevant fact which *only incidentally* showed an offense by reason of betting on athletic games being forbidden in this jurisdiction by R.L.H. 1955, § 288-8. If betting were lawful in Hawaii the relevancy of the proof that defendant was betting on the games would be the same. In the present instance the rule as to proof of other offenses is sought to be used as a shield for defendant against the State's case so as to exclude that which could be shown if no unlawfulness appeared. Relevant evidence cannot be excluded in this manner. *Territory* v. *Warren,* 35 Haw. 232, 236; *cf., People* v. *Glass,* 158 Cal. 650, 112 Pac. 281. As stated in 1 Wharton, *Criminal Evidence,* § 233 at 500 (12th ed.) :

> "If evidence is competent, material, and relevant to the issues on trial, it is not rendered inadmissible merely because it may show that the defendant is guilty of another crime. Such evidence is not admitted because it is proof of the other crime, but because of its relevancy to the charge on trial."

In *State* v. *Adams,* 20 Kan. 311, 319, a leading case cited in *Territory* v. *Warren, supra* at 238, there was involved a charge of burglary. Defendant had been seen coming out of a store with a carpenter's brace stolen from the store which he hid. Defendant was prevented from using it in the subsequent burglary but the court nevertheless deemed the circumstance material since the brace "was an instrument one intending burglary might naturally seek to obtain." The court further concluded that the evidence thereof was not rendered inadmissible by reason of the defendant having stolen the brace instead of borrowing it. The general principle involved was stated by the court as follows:

" * * * whatever testimony tends directly to show the defendant guilty of the crime charged, is competent, although it also tends to show him guilty of another and distinct offense. *The State* v. *Folwell,* 14 Kas. 105. *A party cannot, by multiplying his crimes, diminish the volume of competent testimony against him."* (p. 319; italics added.)

In point in the present case, because evidence of motive was involved, is *Thompson* v. *United States,* 144 Fed. 14 (1st Cir.). The court said:

"Warrantable proofs of other criminal acts for the purpose of establishing a motive for committing the crime charged have sometimes been divided into two classes: First, proofs as to different criminal acts which are explainable as results of the same motive; and, second, proofs of other and independent criminal acts which in and of themselves form the motive for committing the crime alleged against the party and for which he is being tried. The case at bar is unquestionably in the second class." (p. 18)

So here the case is in the second class above referred to. As in *Thompson,* the relevancy of the evidence of betting lies in the motive for committing the crime alleged.

In *Thompson,* the crime alleged was counterfeiting, and the motive was that defendant desired to provide himself with bills to be held in readiness for use as bail, the defendant being an abortionist. The evidence of this was, as stated by the court "in the nature of evidence of statements by the defendant himself as to the character and hazard of his business, and as to why he wanted counterfeit notes for his protection in case of arrest." The court further stated:

" * * * Such evidence is ordinarily admitted for the purpose of showing a situation, or surroundings, which create a motive for committing the offense for which

he is being tried; and it is the fact of the motive, and not the fact of guilt in respect to the collateral crime, which constitutes the essence and force of the evidence, and that is what the jury may weigh upon the question of the innocence or guilt of the party before them in respect to the offense with which he is charged in the indictment.

"It is unnecessary to consider the various exceptions to the general rule of exclusion, for it is evident that the proofs tending to show that the defendant was an abortionist were admitted for the purpose of showing, not the collateral crime as a fact, but for the sole purpose of showing a situation which furnished a motive for committing the particular offense with which he was charged and for which he was being tried. Therefore it is only material to determine whether the evidence admitted, which had reference to the defendant's business and what he said about it, was competent for the purpose of showing a motive for the crime charged, though it also had a tendency to show that the defendant was guilty of other crimes, * * *" (p. 16)

"The conversation referred to tended to show the reasons given by the defendant for taking part in the acts for which he was being tried, and the defendant's business as explained by himself so connected itself with the offense charged as to render his own account of it relevant, and therefore competent and material upon the ground that it tended to show a cause which operated upon his will and induced the criminal acts complained of." (p. 19)

For the reasons so clearly stated in *Thompson* v. *United States, supra,* the evidence under consideration here was admissible not for the purpose of showing the collateral crime of gambling as a fact but instead for the pur-

pose of showing a situation which furnished a motive for committing the offense of bribery with which defendant was charged. This in itself disposes of defendant's further contention as to the insufficiency of the proof. It is argued that defendant's betting could not be shown by his statements alone, reliance being on the rule as to proof of the corpus delicti. That rule recently was considered in *State* v. *Yoshida*, 44 Haw. 352, 354 P. 2d 986. The rule has no application here, even if it be assumed *arguendo* that it is applicable to proof of other offenses. Here there was no necessity of showing that bets actually were placed, for the plan of betting on the basketball games could be inferred from defendant's own statements, and did not have to be inferred from the bets themselves. To go into unnecessary detail as to the bets might even have been objectionable. See 1 Wharton, *Criminal Evidence,* § 239 at 534 (12th ed.). Differing from certain other types of cases, e.g., cases in which the motive is concealment of guilt, the relevance in the present case consists in the profit motive, the gambling as such being without significance in the case. The point as to proof of the corpus delicti is therefore not well taken.

Defendant's contentions as to proof of other offenses are further discussed below in connection with the testimony as to the Kamehameha game. Before proceeding to that, it is necessary to review the evidence. For convenience, we make a complete review of the testimony of certain witnesses before concluding our disposition of defendant's second point. Some of this evidence, however, bears on defendant's third point which is taken up later. For the purpose of following the evidence it will suffice to note that this third point involves defendant's association with Ronald Kakuda in carrying out his plan, and the use against defendant of what Kakuda said to the St. Louis basketball players.

The first St. Louis basketball player called by the State was the one we have referred to as "N." He was not one of those named in the indictment. He testified that defendant would come up to St. Louis High School with Ronald Kakuda before basketball games, usually at lunch time. There was a road that the boys usually would walk down after eating lunch. "Stanley" and "Ronnie" (referring to defendant and Kakuda) would be at the corner of the road in defendant's car. " * * * we would walk down there and just talk about the game * * * Stanley never talked to us about games. * * * " Ronnie "would get out of the car and talk to us and Stanley would wait in the car * * *." Ronnie then "would get in the car and they would go eat." Before they left, "Stanley would say, 'Bye.' " Asked if Stanley said anything else at any time, witness answered: "Goodbye and if we knew what we were doing and stuff like that."

At another point witness testified: "Ronnie would ask if we knew what we was doing and Stanley would say, 'You're sure?' And we would say we're sure and they would drop us off and they would go. * * *"

N. further testified: "There were times when we were right in the car with Yoshida and Ronnie and we would talk about the games." Yoshida "would hardly say anything." Ronnie "was doing most of the talking." Yoshida "would just say if we knew what we were doing and we would answer back, 'Yes, I guess so.' "

Before the Kamehameha game Ronald Kakuda alone came up to the school but: "after the Kam School game, any time they would talk, it would be Ronnie and Yoshida."

Concerning the Maryknoll game N. testified that Yoshida came up to the school with Kakuda as was usual before games, and: "He [referring to Kakuda] talked to us about beating Maryknoll by 11 points but not more

than 11 points and we were all asked if we knew what we were supposed to do." Questioned: "Who asked you?" witness replied: "Both by Stanley and by Ronnie, and * * * every time we played, we were about to play a basketball game, they would come up to the school and would ask the same thing over and over and over." Further, N. testified that he went to dinner "with Ronnie and the boys," referring to Kakuda, James, Francis, Rodney, "and maybe two other boys."

James, one of the players named in the indictment, was the next witness. Questioned first as to the Maryknoll game, he testified that Kakuda "got out of the car, walked to the back near the trunk and then he started to talk to us about the game situation—point spread." Kakuda "said the point spread was 10½ for the Maryknoll game and to stay below 10 points." Witness "would say he [Yoshida] heard it." Further: "After Ronnie Kakuda got through explaining, he walked to the front of the car and told Mr. Yoshida." The boys followed Kakuda, who told Yoshida, as related by James: " 'Well, I think the boys understand.' " Yoshida "turned around and asked if we do understand. We said 'Yes.' " Yoshida then, as related by James, said that " 'Ronald Kakuda would take care of you boys after the game.' "

James further testified that Kakuda took the boys to the Maryknoll game in Yoshida's car. By arrangement, they met Kakuda outside the locker room after the game. They then went to Yoshida's place of employment. Kakuda went in and was seen by the witness talking to Yoshida who gave Kakuda what looked like money— "paper bills." As they came toward the car Yoshida was heard to say, as related by James: " 'Take care of the boys, take them to dinner,' and he [Yoshida] told us 'Good game.' " Previously, witness had testified that the Maryknoll game was won by eight points.

On leaving Yoshida's place of employment Kakuda took the four boys to dinner at a Waikiki restaurant and Kakuda paid the bill, which was $57. Subsequent to this, there were four games—four different occasions —when Yoshida and Kakuda "came up there."

On cross-examination James was asked whether it could have been some other game, not the Maryknoll game, which was the subject of the happenings he had related. He answered that he was positive it was the Maryknoll game, saying: "This is one game that we had to hold the score down." As to an offer or promise of a thing of value, all that was brought out on cross-examination was the witness' testimony, when questioned as to his previous statement to the police, that he had told the police "we were promised dinner after the game by Mr. Yoshida, which was told us by Mr. Kakuda." On redirect, he was asked why he was so positive "in regard to the Maryknoll game and the point spread," and he then testified without objection at page 54 of the transcript that there was one other game, besides the Maryknoll game, in which he was asked to keep the score below a certain point spread, and that was the first Kamehameha game, an earlier game as shown by other evidence. He was not questioned further by either party as to the promise of a dinner.

For defendant to argue, as he does argue as part of his second point, that there was no complete proof of an offense committed as to the Kamehameha game because there was no proof of an offer or promise of a thing of value on that occasion, is to ignore the record of what transpired at the trial. Defense counsel, on cross-examination, had sought to eliminate the Maryknoll game as the one involved. On redirect it was brought out that there were two in which the point spread was involved, of which this one was the second. Defendant's counsel

on this appeal cannot complain because the redirect, in not also showing bribery on the first occasion, was not more prejudicial to defendant than it was.

There are many instances in which proffered evidence. is admissible only because it tends to show some element of the offense charged on which no light is shed by other acts unless they are guilty ones. In such a case the court will evaluate the substantiality of the proof of guilt of another offense. Such were the cases in this jurisdiction cited by defendant, *Territory* v. *Awana,* and *Territory* v. *Caminos, supra,* in which the sufficiency of the proof of other offenses was discussed from the standpoint of admissibility thereof to show criminal intent. Distinguishable also are the Missouri cases cited by defendant, in each of which the State sought to show other guilty acts. In contrast, it is the defendant in the present case who is bringing up the matter of guilt of other crimes when the admissibility of the evidence does not turn on any such showing; defendant's demand that such guilt be established, made as the second point of the brief here but not at the trial, is a bootstrap argument. No reversible error has been shown by the second point.

Before proceeding to defendant's third point we review the testimony of Francis ............., another player named in the indictment, the State's last witness. He testified that in company with three other boys (including the witnesses N. and James) he saw Kakuda and Yoshida at the school at lunch hour, before the Maryknoll game. After the boys conversed with Kakuda in back of the car, they returned to the car, where Yoshida was sitting and "was saying if everything was all right." Kakuda said if the point spread came out "he'll fix us up with dinner," and Yoshida said "that Ronnie will fix us up." Asked "with what" the witness answered: "Good eat." Yoshida told the boys "that Ronnie would fix us up to eat, for anything what we wanted."

Defendant's third point is that the court erred in refusing to give defendant's requested instruction No. 8 and in giving prosecution's requested instruction No. 6.

No. 8, as presented by defendant and refused, read as follows:

"If you find that Stanley Yoshida could not hear the alleged conversation between the St. Louis players and Ronald Kakuda at the St. Louis campus on the day of the Maryknoll-St. Louis game, you are to disregard all of the statements alleged to have been made by the said Ronald Kakuda and you must find the defendant not guilty."

Prosecution's No. 6 read in part as follows:

"If therefore you find and believe from the evidence beyond a reasonable doubt that the defendant, Stanley K. Yoshida, did aid, abet, countenance or encourage another or did himself offer or promise Francis .............., James .............. and Rodney .............. a dinner with intent to influence them to limit their team's margin of victory against Maryknoll, you will find the defendant guilty as charged."

Other parts of prosecution's No. 6 were the subject of objection in the court below, but as to them no argument now is presented. However, the specification of errors includes an attack on the portion of the instruction relating to circumstantial evidence of the offer or promise. In this part of the instruction the jury were told that the offer or promise of a dinner "need not be expressly stated in all its terms but may be implied and inferred from all the facts and circumstances in the case before you." This specification not being argued must be deemed abandoned. In any event, it is without merit. *People* v. *Graves,* 137 Cal. App. 1, 13, 29 P. 2d 807, 813, 30 P. 2d 508. The jury was instructed on the nature of circumstantial evidence without objection.

The present argument is that prosecution's No. 6 "was intended as an application [to] the facts of the case [of] Section 252-1, Revised Laws of Hawaii, 1955;" and that: "As given, it misstated said statute which requires 'presence.'" Further, it is argued that it was not the theory of the prosecution that defendant was an accessory before the fact who could be convicted of the offense under R.L.H. 1955, §§ 252-3 and 252-4. This latter appears to be the case. However, there was no prejudicial error in the giving of No. 6.

Another instruction, prosecution's No. 2, was a verbatim statement of R.L.H. 1955, § 252-1. It read as follows:

"All who take part in the commission of any offense, or, being present, aid, incite, countenance or encourage others in the commission thereof, shall be deemed principals therein."

When No. 6 was given the jury already had been instructed by No. 2 that, in order for defendant to be deemed a principal, he must have been present. It is well settled that the instructions must be considered as a whole. One may be supplemented by another. *Ciacci* v. *Woolley,* 33 Haw. 247, 261; *Territory* v. *Aquino,* 43 Haw. 347, 380. In the present case, the instructions were not inconsistent. Compare *Territory* v. *Robello,* 20 Haw. 7, 31, with *Territory* v. *Richardson,* 17 Haw. 231, 236. Though No. 6 was not quite complete in itself, and had the request been made for the inclusion in No. 6 of the words "being present" the request would have been a proper one, the omission of these words from No. 6 was not objected to at the time of settlement of the instructions. No prejudicial error was committed. At most, as stated in *Ginoza* v. *Takai Electric Co.,* 40 Haw. 691, 710: "'The instruction * * * may be characterized as an *incomplete* direction.'" And as further stated in *Ginoza:* "'In such case, an appellant is in no position to complain, where he does

not ask for a more specific and explicit instruction.' "

Defendant's principal complaint is the refusal of his instruction No. 8 and the absence of any specific instruction to the jury to consider whether defendant could hear what was said by Kakuda, which instruction it is contended should have been given with other specific instructions. The argument is that defendant was not answerable for anything that Kakuda said to the players if Kakuda's statements were not made within earshot of defendant, unless there was proof of a conspiracy between Kakuda and defendant independent of what Kakuda said out of defendant's hearing. Of all of this, it is contended, the jury should have been apprised.

In the first place, it is well settled that when, as here, appellant was represented at the trial by counsel, error cannot be predicated on the failure to give an instruction that was not requested or that was requested only in erroneous terms. *Republic of Hawaii* v. *Edwards,* 11 Haw. 571, 575; *Van Poole* v. *Nippu Jiji,* 34 Haw. 354, 361; *Bonilla* v. *Mutual Telephone Co.,* 40 Haw. 417, 421. Defendant's requested instruction No. 8 did not take into account the possibility of a conspiracy between Kakuda and defendant. It was not so framed as to present to the jury that which now, perforce, is conceded, namely that Kakuda's statements could be considered by the jury if made pursuant to and in furtherance of a conspiracy between the declarant and appellant. Neither admissibility of Kakuda's statements in evidence nor the guilt of the defendant turned upon the question whether defendant could hear the conversation in back of the car. It is well settled that:

"* * * when there is a conspiracy among several persons to commit a crime, and in its furtherance the crime agreed to be committed is accomplished by one of them, any or all of the conspirators * * * may, upon proper

proof, be convicted [of the crime thus committed] although the indictment does not allege a conspiracy * * *." *Territory* v. *Blackman,* 32 Haw. 460, 464.

As so often has been stated: " 'When men enter into an agreement for an unlawful end, they become ad hoc agents for one another, * * *. What one does pursuant to their purpose, all do * * *.' " *Territory* v. *Kitabayashi,* 41 Haw. 428, 433. The turning point of the case therefore is the proof of the conspiracy between Kakuda and defendant. Unless the proof of the conspiracy was insufficient to go to the jury defendant was not entitled to instruction No. 8. The sufficiency of this proof now will be considered and, since specification No. 6 that "the evidence was insufficient for the jury to return a verdict of guilty as charged" was not separately argued in defendant's brief, that specification will be considered in connection with the proof of the conspiracy.

Defendant relies on the rule stated in *Glasser* v. *United States,* 315 U.S. 60, 74, that "declarations are admissible over the objection of an alleged co-conspirator, who was not present when they were made, only if there is proof *aliunde* that he is connected with the conspiracy. * * * Otherwise, hearsay would lift itself by its own bootstraps to the level of competent evidence." That was said of an alleged co-conspirator who was not shown to have even known that any meeting was taking place. The present case is unlike *Glasser.* The jury could find that defendant, who accompanied Kakuda to the scene and departed with him, was present as a principal, dependent upon the proof as to the common purpose between them. See *Territory* v. *Ebarra,* 39 Haw. 488. A principal, of course, need not be immediately present as an eye and ear witness of what passes. *Territory* v. *Bollianday,* 39 Haw. 590; *Lewis* v. *State,* 155 Tex. Crim. 544, 237 S.W. 2d 293, 298.

Moreover, we are not concerned with the admissibility

of hearsay declarations. Defendant speaks of declarations but acts are involved. When a bribery involves a communication to the one bribed as to what he is being bribed to do, that communication is a "verbal act." *State* v. *Moore,* 168 Ohio 270, 150 N.E. 2d 323, 326. The distinction between "declarations" and "acts" of a co-conspirator, often important in determining the admissibility of proffered evidence (see *Territory* v. *Kitabayashi, supra* at 436-439) is not to be overlooked.

Here we have proof that defendant drove Kakuda up to the school grounds to find the boys, and that he lent his countenance to whatever Kakuda said by remaining available in the car and, after Kakuda's conversation, himself checking with the boys to see if they had understood what Kakuda had said and also to assure them they would be taken care of after the game. Defendant thus made it plain that he was associated with Kakuda in some enterprise and was there in furtherance of that enterprise. The evidence shows further that the offer of a dinner—to which Francis testified—was carried out after the game with money furnished by defendant. So aside from Francis' testimony that defendant himself, as well as Kakuda, had said that the boys would be fixed up with a "good eat," defendant's connection with the scheme was further corroborated.

The jury certainly could infer that, by prearrangement, Kakuda on behalf of Yoshida was to importune the boys to do something in connection with the Maryknoll game. What they were to do appears squarely only from what was said in back of the car, though Francis' testimony directly implicated defendant in the offer of a dinner. However, it could be inferred, from the efforts made by the conspirators to protect defendant from direct contact with the conversation, that something unlawful was in view. It also could be inferred that it was not planned

to cause the game to be lost, since defendant subsequently expressed his pleasure in the results. Thus the jury could infer that the plan was to bring about the limitation of the margin of victory.

The existence of a conspiracy may be inferred from the circumstances. *Hashimoto* v. *Halm,* 40 Haw. 354, 362; *Territory* v. *Soga,* 20 Haw. 71, 76; *Territory* v. *Goto,* 27 Haw. 65, 75; *The King* v. *Anderson,* 1 Haw. 41; *Delli Paoli* v. *United States,* 352 U.S. 232, 236. The inference here was strong enough to permit Kakuda's statements to the boys to be attributed to defendant whether he heard them or not. Defendant was present at the scene aiding in the execution of the common plan, and if he was not able to observe what was going on it was because it was arranged that way, just as in the case of one stationed as watchman. See *Territory* v. *Bollianday, supra* at 593; *State* v. *Carvelo, supra; Lewis* v. *State, supra* at 298.

Defendant relies upon a rule applicable in quite a different situation. Typically, in that situation as in *Glasser* the principal proof against a defendant is what his alleged co-conspirator said about his involvement in the scheme, as when A says to B that C can be bribed. When, however, a defendant's involvement in the scheme sufficiently appears from independent proof, the exact nature of the scheme may be shown by the acts and declarations of the co-conspirators. See *United States* v. *Avellino, Appeal of Rossello,* 216 F. 2d 877, 880 (3d Cir.); *Braatelien* v. *United States,* 147 F. 2d 888, 893 (8th Cir.); *Delli Paoli* v. *United States, supra,* annotated 1 L.Ed. 2d 1780, 1785; *cf., United States* v. *Renda,* 56 F. 2d 601 (2d Cir.).

We have concluded that defendant's requested instruction No. 8 was fatally defective for failure to take into account defendant's possible culpability by virtue of a conspiracy of which there was sufficient evidence to go to

the jury, and accordingly the refusal of the instruction was not reversible error.

Judgment affirmed.

*Hyman M. Greenstein* (*Greenstein & Franklin* and *Ton Seek Pai*) for defendant-plaintiff in error.

*John H. Peters,* Prosecuting Attorney, City and County of Honolulu, and *Lincoln J. Ishida,* Deputy Prosecuting Attorney, for the State, defendant in error.